# THE LOUIS ECKELS AND SONS ICE MANUFAC-
TURING COMPANY vs. CORNELL
ECONOMIZER COMPANY.

*Contracts: evidence; antecedent conversations; construction of
contracts for the Court. Bills and notes: parol evidence, may
not destroy import. Evidence: exclusion of correct—;
verbal facts; scientific books. Production of books
and papers used in cross-examination. Sale of
machinery: guaranty; breach: burden of
vroof; tests; waiver by giving notes.*

An antecedent conversation is inadmissible to supplant an agree-
ment in writing.                                      p. 111

It is not reversible error to exclude testimony proper to ·intro-
duce in evidence, where the same facts have already been
proved by other testimony, and its exclusion did not injure
the party who sought to offer it.                     p. 113

Where it is a controverted question whether certain statements
were made or not, irrespective of their truth, evidence may
be given of the conversation, as of other facts sought to be
proved.                                              p. 113

Scientific books are not admissible in evidence.      p. 113

But in cross-examination questions may be based upon the con-
tents of such books, or upon extracts from them, in order to
test the value of the opinion of a witness.          p. 114

The rule that the Court has power to compel a cross-examining
counsel to produce a book or paper as to which he is exam-
ining a witness, and to submit it to the examination of the
opposing counsel so that he may use it for re-examining the
witness, does not apply to evidence that would be inadmis-
sible if offered.                                     p. 115

Where a paper called for by one party is produced by the
other and inspected by the party calling for it, it becomes
evidence for both parties, and the jury can not be restricted
to a consideration of part of it alone.              p. 116

But the exclusion of part of the paper from the jury's consideration is not reversible error when the part excluded could not have benefitted the exceptant. p. 116

Where there is any evidence tending to support the defence, a plaintiff's prayer is erroneous which asserts that there is no evidence legally sufficient to support the defence. p. 116

The construction of contracts is for the Court and not for the jury. pp. 116-117

In a suit for the contract price of a boiler that was guaranteed to show a certain efficiency and economy, the defence was that the results guaranteed were not attained; *held that,* in such a case the question of the sufficiency of the test was for the jury to decide. p. 117

It was upon the defendant to show a failure of consideration. p. 117

Whether or not the boiler had been operated according to the instructions furnished by the vendor was a question for the jury. p. 117

Where a guaranteed article has been tested, the giving of notes for the payment of its purchase price, operates as a waiver of defences on the ground of any alleged breach of warranty. pp. 118-119

In a suit for the purchase price agreed to be paid for a machine, a prayer requiring the jury to find for the defendant if they should find that the machinery was not a "practicable appliance" is erroneous, as it would allow the jury to find as they pleased. p. 119

The maker of a note will not be allowed to destroy its legal import and operation by the introduction of parol testimony; he will not be allowed to contradict the note by any alleged previous statement of the payee that the note would not have to be paid. p. 120

Where a defendant takes defence on one clause of a warranty only, a prayer that directs a verdict in his favor if the jury find any failure in other clauses of the warranty is erroneous. p. 121

*Decided December 5th, 1912.*

Appeal from the Superior Court of Baltimore City (AMBLER, J.).

The facts are stated in the opinion of the Court.

The cause was argued before BOYD, C. J., BRISCOE, PEARCE, BURKE, THOMAS, PATTISON and STOCKBRIDGE, JJ.

*Harry E. Parkhurt* and *Wm. P. Lyons,* for the appellant.

*G. Ridgely Sappington* and *Charles G. Baldwin,* for the appellee.

PEARCE, J., delivered the opinion of the Court.

This is the defendants appeal from a judgment obtained by the appellee in the Superior Court of Baltimore City. The defendant is a corporation under the laws of Maryland, owning and operating a plant in the City of Baltimore for the manufacture of ice, and the plaintiff is a corporation of the City of Philadelphia, and the owner of a patented device called "Cornell Patent Economizer and Smoke Consumer."

The declaration contains the common money counts, and two special counts; one upon a promissory note dated March 17th, 1910, for $820 made by the defendant, and payable to the order of the plaintiff on August 17th, 1910; and the other upon another promissory note of the same date for $832 made by the defendant, and payable to the order of the plaintiff on November 17th, 1910. The pleas were "never indebted as alleged," and "never promised as alleged," upon which, issue was joined.

These two notes represented the contract price, with interest added, of two Cornell Patent Economizers and Smoke Consumers with which the plaintiff had equipped two of the boilers of the defendant's ice plant, of one hundred rated horse power each, under the terms of a written contract between the parties, made Aug. 23rd, 1909.

At the trial, the plaintiff relied on the promissory notes, and the defendant set up a total failure of consideration. The contract contained the following four guarantees on the part of the plaintiff:

"A. To fulfill all conditions imposed by local laws and ordinances, governing the use of apparatus and processes for the prevention of smoke, that may be in force within the territory in which this installation is made.

B. To effect a saving of not less than 15 per cent., or a proportional increase, in boiler capacity, when said boilers are run to their full rated capacity, and in accordance with our instructions; it being understood that any saving effected by the use of cheaper grade of fuel is to be accounted as part of same; otherwise, the guaranteed saving is to be made by comparison with the same kind and grade of fuel.

C. To remove the apparatus free of cost to the purchaser at the expiration of thirty days trial, if the guaranteed efficiency has not been demonstrated; provided that the Cornell Economizer Company shall first have the right to personally conduct a United States Standard Blow-Off Test, without expense to it, before being required to remove the apparatus.

D. To replace all parts of apparatus that may be found defective in material or workmanship, during the term of one year from date of installation, provided that such defects shall not be due to improper use while in possession of the purchaser."

The contract price was $1,600; "payment to be made by notes due May 1st, 1910, and August 1st, 1910, to be dated 30 days after installation of device, with interest added."

The device was installed in the latter part of September or the early part of October, 1909, under the plaintiff's instructions. The only breach complained of was under guarantee B, the defendant claiming that no saving whatever had been effected by the use of the device. At the trial, the plaintiff proved the execution and delivery of the two notes described in the *narr.,* and that nothing had been paid on

either, and on cross-examination of the witness, the treasurer of the plaintiff, by whom the notes were proved, the defendant showed the consideration of the notes to be the installation of the plaintiffs device under the contract mentioned, which it produced and put in evidence. Here the plaintiff rested.

Frederick W. Eckels, the president and manager of the defendant, testified that sometime in August, 1909, E. B. Cornell of the plaintiff company, called on him about purchasing this device, and "told us he would guarantee to save us not less than 15 per cent. and possibly from 30 to 35." Here counsel for plaintiff interposed, saying, "We do not object to 15 per cent. because that is in the terms of the contract, but further than that we object." The answer was not completed, and the witness was then asked, "That is 15 per cent. of what?" to which question the plaintiff objected and the Court sustained the objection. This is the ground of the first exception.

As this conversation referred to, antedated the contract, it is obvious that this was an attempt, as expressed in *Warren Glass Co.* v. *Keystone Co.*, 65 Md. 547, "to supplant an agreement in writing by parol testimony." There is no ambiguity or vagueness in the terms of this guarantee requiring explanation by parol testimony or extrinsic evidence, as in the cases cited by the appellant. The increase guaranteed was plainly stated to be "increase in *boiler capacity,* when said boilers are run to their full rated capacity in accordance with our instructions," and the rate of increase was to be "not less than 15 per cent." To permit the defendant to state either in *what respect* saving was to be effected, or to *what extent,* when the contract supplied the plain unambiguous answer to both these inquiries, would have been plain error, and the ruling was therefore correct.

The second and third exceptions may be considered together.

Edward H. Davis testified that he was defendant's night engineer from September 7th, 1909, until January 1st, 1910,

and returned to its service as chief engineer on May 21st, 1910, which position he held when testifying. He gave his experience in engineering, and described in detail the construction and operation of the device. He said that it *increased* the consumption of coal on one boiler half a ton in 12 hours, and gave *no increase of useful steam;* that he made no test up to the time then referred to, but told Mr. F. W. Eckels the result of his observation; that a little later, May 31st, 1910, he made an enact test, and found that he used as much coal under the 100 horse-power boiler, with that device, as he did under a 125 horse-power boiler in use in the plant, without that device, and that he communicated to Mr. Eckles all the details and result of the test thus made; and that the result was that he was burning 1100 pounds more of coal in 12 hours under the 100 horse-power boiler than under the 125 horse-power boiler, *and getting less horse power out of it;* that the 100 horse-power boiler, internally and externally, was as clean as man could make it, and the test lasted six or seven days, and that they were using the same coal on all three boilers, and they had no trouble about the burning of the coal. He also testified that there was constant accumulation of dirt around the retorts through which the steam was caused to pass, and which were a special feature of the device, and that this accumulation of dirt impaired the efficiency of the retorts, and caused increased consumption of coal; that the retorts could not be cleaned while the boilers were running; that he informed Mr. Eckles of all these facts, and that with the defendant's consent he took the retorts out and burned less coal than with them, and got practically the same evaporation.

Mr. F. W. Eckles testified at length, describing the device and its operation, and said they were using the same grade of coal at first, on all the boilers, but later got a better grade, the best they could get, but got no better results.

During his testimony, defendant's counsel said he wished to show that complaints were made by the engineer to defendants "about the amount of coal used," and asked the

witness, "Did you receive complaints about the coal being used, from the engineer who was on the stand?" and the Court sustaining the plaintiff's objection to this · question, the second exception was taken.

He was then asked, "Did you receive complaints from the engineer who was on the stand about the retorts getting dirty and being clogged with dirt?" and the plaintiff's objection thereto being sustained, the third exception was taken.

It is sometimes a controverted question whether certain things were said, irrespective of whether what was said, is true or untrue, and if in this case, evidence had not been given previously that complaints were made, and the nature of these complaints, it would have been proper to ask the questions above stated.   But both Davis and Eckels had already testified both to the fact and character of the complaints made, and the defendant could not be injured by refusing a mere repetition of the fact, that complaints had been made.   If it could be held technically an error to exclude these questions, it was clearly not a harmful error.

Dr. W. B. D. Penniman having qualified as an expert in the use of steam and in boiler tests as to consumption of coal and efficiency of steam, testified that this device is not novel, but is well known to him, and that it was impossible by it to effect the saving claimed for it, or any saving at all. On cross-examination, he was asked if he knew Powers Magazine, which counsel then held in his hand, and said that he did.   He was then asked if that magazine stated steam could be decomposed by a device such as the one in question, whether he would adhere to the opinion he had expressed, he replied that he would.   Thereupon, upon cross-examination, defendant's counsel asked to have the magazine, which plaintiff's counsel refused, saying it had not been offered in evidence, and the Court refused to require plaintiff's counsel to produce it.   This constitutes the fourth exception.

"All the weight of authority is against the admission of scientific books in evidence."   8*th Enc. Pl. & Pr.* 768 ; 9*th*

*Amer. & Eng. Enc. Law, 2nd Ed.,* page 887, and in this State it was held in the leading case of *Davis* v. *State,* 38 Md. 15, that "Medical books are not admissible in evidence, either for the purpose of sustaining or contradicting the opinion of the witness." But it is generally held, that in cross-examination questions may be based upon the contents thereof, or extracts therefrom to test the value of the opinion of the witness. 8*th Enc. Pl. & Pr.* 768; and such is the practice in this State. It was under this practice that Dr. Penniman was asked the question whether if that magazine stated that steam could be decomposed in a device such as the Cornell Economizer, his contrary opinion would be affected thereby. There was no objection made to that question, and the exception taken does not involve the correctness either of the above rule, or its exception above stated. It presents simply a question of the *power* of the Court to compel the cross-examining counsel to produce the magazine in question, and to submit it to his opponent for inspection and use in his own re-examination of the witness. Upon that question we have been referred to no adjudication. The appellant quotes *Mr. Wigmore,* Vol. 3, sec. 1861, to the effect "that where a party having a document at the trial, *uses it for any evidential purpose,* fairness requires him to submit it for the opponent's inspection, *even though* the former has not technically and finally put it in evidence."

The question, however, is not one of fairness or liberality on the part of counsel, but of *power* on the part of the Court. We think, moreover, that the language of Mr. Wigmore is applicable only to documents (or books) which would be admissible in evidence if offered. This is directly implied in the language of the extract which we have italicized. Otherwise, documents or books, which are expressly declared to be inadmissible would thus be made admissible. Nor do we think that this exception comes within the rule in sections 132 and 134 of *Poe's Practice* referred to by the appellee, governing failures to produce papers upon due notice, where the only legal effect of non-production is to

permit the party who has called for them, to prove the contents by secondary evidence.   Manifestly, that rule can have no application to this exception, because the contents of the book itself, the original document, are intrinsically inadmissible, and the Court can have no power to compel a party or his counsel to produce, and submit to inspection, a scientific book, which, when produced and inspected, could not be admitted in evidence, or be used by a cross-examiner for the restricted purpose above stated.   It was decided in a case cited on the appellant's brief, *Boyle* v. *Boston El. R. R.,* 208 Mass. 41, that one party cannot make a paper otherwise incompetent as evidence, competent in his favor, by calling for it and inspecting it on its being produced on his call. There was no error in the ruling on this exception.

The fifth exception was taken to the admission in evidence of a letter from plaintiff to defendant, dated January 5th, 1910, in which plaintiff demanded the execution and delivery of the two notes stipulated for in the contract, and called defendant's attention to guarantee C, which provides for a Standard Blow-Off Test, at its expense, to prove that plaintiff was making a minimum saving of 15 per cent. in accordance with the contract, stating that it did not wish to put defendant to this expense if settlement could be made without such test.   Plaintiff's counsel asked defendant's counsel if they had this letter, and they replied they had, but objected to its being offered, but the Court overruled the objection, and the letter was produced and read by plaintiff's counsel to the jury, stating that it was for the purpose of showing that they had the right to demand this test, and the Court instructed the jury that no other statements contained in the letter were evidence of the facts therein set forth.

Mr. Poe states in his work on Practice, Ch. 8, sec. 135, that where a paper is called for by one party, produced by the other party, and inspected by the party calling for it, it thereby becomes evidence for both parties.   Mr. Greenleaf, in section 563, states that such is the English rule,

though he adds that in the American Courts the rule on this subject is not uniform. That rule, however, has been recognized in this State in *Morrison* v. *Whiteside,* 17 Md. 459. There was, therefore, no error in treating the letter as in evidence. But the appellant contends that even so, the *whole* letter was made evidence, and that it was error to exclude from the jury, all the contents of the letter except that which referred to the right to a Blow-Off Test; and we are compelled to agree that when an instrument is forced into the evidence under this rule, and thus made evidence *for both parties,* that the jury cannot be restricted to the consideration of a *part only,* unless it clearly appears that this restriction could work no injury to the exceptant. We have carefully examined this letter, and we can discover nothing in the excluded part which could by any possibility benefit the defendant. Indeed, the admission of the excluded portions would have been distinctly prejudicial to the defendant, since all those portions, consist of statements by the writer, not under oath, and contradictory of the testimony given by the defendants. We think, therefore, there was no concurrence of injury with technical error in this ruling.

This brings us to the prayers.

The sole defence was failure to produce the guaranteed saving of 15 per cent. There was evidence *tending* to support this defence, and for that reason the plaintiff's 1st prayer which asserted there was no evidence legally sufficient to establish any defence to said notes, and its 2nd prayer which asserted there was no evidence legally sufficient to show failure of consideration for the notes sued on were both properly refused.

The plaintiff's third, fourth, fifth and sixth prayers were properly granted.

The third prayer involved the same principle which governed the ruling on the first exception, in refusing to allow Eckels to answer the question, "15 per cent. of what?" Guarantee B stated in clear and unambiguous language just what was gauranteed. Its construction was for the Court, and we

think the construction given was the only reasonable one, and clearly intelligible to the minds of the jurors.

The fourth prayer told the jury that unless they found the test described by Davis was sufficiently accurate to enable them to find with reasonable certainty whether any saving had been effected they should disregard it. The conditions of that test were of the most perfunctory character, and its sufficiency was a question for the jury. In *Hawley Furnace Co.* v. *Hooper*, 90 Md. 397, where a very similar guarantee was considered it was declared to be the duty of the jury "to inquire whether the test actually made was sufficiently accurate to enable them to find with reasonable certainty whether there had been an actual saving as required by the written contract."

The fifth prayer instructed the jury that the burden of proof was on the defendant to show there was no failure of consideration. This is the general doctrine, 8 *Cyc.* 225, and the rule in this State. *Ingersoll* v. *Martin*, 58 Md. 67.

The sixth prayer instructed the jury that in determining whether the guarantee was fulfilled, they must consider whether the machines were operated according to the instructions furnished by the plaintiff. This was an express condition of the guarantee, and a material question for the jury's consideration. The defendant offered eleven prayers all of which were refused, and in lieu thereof, the Court, of its own motion, gave the following instruction:

"The jury is instructed that the meaning of the guarantee in clause B of the contract between the plaintiff and the defendant which has been offered in evidence in this case. was that the plaintiff's patented device would effect a saving of fifteen per cent. either by lessening consumption of fuel, or by increasing the boiler capacity, and if the jury shall find that under the said contract the plaintiff equipped two of the defendant's boilers with the said device, and that for several months the two boilers so equipped were fairly operated by the defendant in accordance with the printed instructions furnished by the plaintiff, and while so operated

failed to show any saving whatever, either in lessened consumption of fuel or in increased boiler capacity, and that thereupon the device was permanently removed by the defendant from each of said boilers, then the verdict of the jury must be for the defendant."

Upon comparing this instruction with the defendant's first, fourth and fifth prayers it will be seen that the Court's instruction covered all that was asked for in the designated prayers of the defendant.

The defendant's third prayer declaring that the giving of the note in this case did not constitute a waiver of the guaranty in clause B of the contract was properly rejected. The evidence showed that the device was installed in September or early in October; that the defendant told certain engineers who inspected its plant sometime in November that the consumption of coal had been reduced thereby from 11 to 7 tons of coal per day, and that as they had no storage facilities and the coal was hauled in carts practically as needed, it was easy to determine the saving; that the device was not defective when the notes were given five months after installation; that there was never any trouble except the removal of dirt which accumulated around the retorts; that when the notes were sent for execution, defendant said they had consulted their engineer "and found the device was in good working shape;" that the only objection made to the execution of the notes then sent, was that they bore date 30 days after installment as stipulated in the contract, while defendant claimed they should bear date from the time when they determined the device was in good working shape, and the notes were so changed, thereby abating the interest on said notes from November 1st to March 17th, and that the notes were then executed and delivered, and that no complaint was thereafter made until the letter of April 23rd "that some dirt had been blown out of the stack," and that after that letter defendant had no communication with the plaintiff. These facts bring this case distinctly within the rule announced in *Adler* v. *Portner Brewing Co.,* 65 Md. 27, and

so emphatically approved in *Hinchman* v. *Johnson,* 108 Md. 661.

In *Adler* v. *Portner,* which was a case of this character, the defendant, Adler, testified "that he gave his notes in May, 1883, for machinery purchased with warranty in September, 1882, because Portner was threatening to sue him and he did not want to be sued; he wanted time to test the machine; he could find out whether the machine would work or not by the time the first note would mature (four months) and if it would not work he would not pay the notes." JUDGE BRYAN, speaking for the Court, said: "If there was a breach of warranty, he knew it at that time; or at least he had the most ample opportunity of ascertaining it. * * * Some significance must be attributed to the giving of a note. In good faith it imports that the maker will pay it at maturity. * * * We can give to the defendant's conduct no interpretation consistent with good faith, except that he had no purpose of refusing to pay these notes. This clearly implied that he would make no objection to the amount claimed to be due as the purchase money of the machines. After this, the defence arising from an alleged breach of warranty, or from any other cause, could not, in good faith, be set up in bar of a suit on this account."

The defendant's sixth, seventh and eighth prayers were properly rejected as each of them was based upon matters not within the defendant's guarantee, and each of them directed an absolute verdict for defendant. The eighth prayer moreover required a verdict for defendant if the jury found that the appliance "was not a practical appliance," which would have given them a free hand to find as they pleased.

The defendant's ninth prayer asked that the jury be instructed that the giving of the notes in this case was not a waiver of the guarantee, and that the burden of proof was upon the plaintiff to show that the device fulfilled the guarantee. From what we have said in passing upon the plaintiff's fifth prayer and on the defendant's third prayer, this prayer was properly rejected.

Everything that was properly asked for in the defendant's tenth prayer was embraced in the Court's instruction, and the tenth prayer moreover was obnoxious, because it allowed the jury to speculate as to "unusual conditions, such as extreme draft and heat which if continued would destroy the boilers."

The defendant's eleventh prayer was based upon the theory that the notes were given upon Mr. Cornell's statement that defendant would not have to pay the notes when due if the appliance did not do all it was guaranteed to do. This statement was denied by Cornell in rebuttal, but assuming it to have been made, it appears from the testimony of F. W. Eckels that the notes were given three or four months after the alleged statement by Cornell, and the correspondence at the time the notes were given makes no reference to any such conditions, nor does the defendant's letter of April 18th, 1910, which F. W. Eckels says was the last communication between the parties. In any event this alleged statement antedated the giving of the notes, and the law will not permit the maker of a note to destroy its legal import and operation by the introduction of parol evidence. It was so held in *McSherry* v. *Brooks,* 46 Md. 118, where JUDGE ALVEY said: "This would be to contradict and limit the written contract by mere parol; and the question is, can this be done? 'What is to become of bills of exchange and promissory notes' asked LORD ELLENBOROUGH in *Hoare* v. *Graham,* 3 Camp. 57, "if they may be cut down by a secret agreement, that they shall not be put in suit." * * * "If parties mean to vary the legal operation of an instrument they ought to express such variance; if they do not express it the legal operation of the instrument remains."

*Perry* v. *Bigelow,* 128 Mass. 129, was a suit between maker and payee and parol evidence was held inadmissible to show it was not intended to operate as a note, but merely as a memorandum that certain certificates of stock mentioned in the note as collateral should operate as payment at maturity, if the note was not paid before, and in *Aultman Miller*

*& Co.* v. *Hawk* (Neb.), 95 N. W. Rep. 695, it was held that a promissory note in a suit between payee and maker can not be contradicted, altered or varied by evidence of a prior or contemporaneous parol agreement.    See cases cited in 17 *Cyc.* 644.

The defendant's second prayer remains for consideration. This asserts that the meaning of clause C in the contract is that the plaintiff was entitled to a Blow-Out Test before it could be required to remove the apparatus without cost to the defendant; and that if defendant did not avail itself of this clause, it was still entitled to require full performance of all the other guarantees of the contract.

We think this was clearly correct *as an abstract proposition,* because the defendant was entitled to require full performance of *each* clause of the guarantee, but the *only* clause under which a breach was claimed by the defendant, was clause B, and as to this clause, we have said the jury was properly instructed.    The construction of clause C, and its effect upon the other clauses of the contract became an academic question, the ruling upon which could not prejudice the defendant.    We have given this case the most careful consideration, and our conclusion is that the whole case was fully and fairly submitted to the jury upon the granted instructions.

> *Judgment affirmed, with costs to the appellee above and below.*