JOHN A. JOHNSON & SONS, Inc., et al. v. UNITED STATES, to Use of BALTI-MORE BRICK CO.

SAME v. FRIEDMAN.

Nos. 5437, 5438.

Circuit Court of Appeals, Fourth Circuit.

Feb. 6, 1946.

Joseph L. Carter and George W. S. Musgrave, both of Baltimore, Md., for appellants John A. Johnson & Sons, Inc., and American Surety Co. of New York.

Leo M. Alpert, of Baltimore, Md. (Julian Jawitz and Howard Hen'g, both of New York City, on the brief), for J. Friedman Co.

Jesse Slingluff, Jr., of Baltimore, Md., for Baltimore Brick Co.

Before SOPER and DOBIE, Circuit Judges, and GILLIAM, District Judge.

GILLIAM, District Judge.

This litigation, now consisting of two controversies, one between the Baltimore Brick Company on the one hand and John A. Johnson & Sons, Inc., American Surety Company of New York, and J. Friedman Company on the other, and a second controversy between J. Friedman Company on the one hand and John A. Johnson & Sons, Inc. and American Surety Company of New York on the other, had its inception

when a suit was filed in the District Court of the United States for the District of Maryland under the Miller Act, 40 U.S.C.A. §§ 270a to 270c, in the name of the United States of America, to the use of Baltimore Brick Company, to recover a balance alleged to be due for brick furnished and delivered by the Baltimore Brick Company under a contract between John A. Johnson & Sons, Inc., general contractor, and the United States of America, for the construction of certain buildings at Jarboesville, Maryland. The American Surety Company of New York bound itself as surety for the performance of the contract by Johnson.

The J. Friedman Company, a subcontractor which made a contract with Johnson to do the masonry and concrete work, having expressed a desire to be made a third party defendant, Johnson moved the Court for such an order and J. Friedman Company was made a party to the action.

There was no dispute about the balance due by Johnson and Friedman to the Brick Company, if anything should be found to be due, but Friedman defended and set up a counterclaim against the Brick Company, alleging that the Brick Company had breached its contract to furnish and deliver "new common brick made from clay or shale and (which) comply with A. S. T. M. Specification C 62-41T, Grade MW," as provided for in the specifications and as agreed by the Brick Company in its letter to Friedman and Johnson, dated January 10, 1944, reading as follows: "This Company certifies that all the Grade M (synonymous with Grade MW) bricks that have been or will be delivered to you for the construction of the masonry work on the above mentioned project have been and will be in accordance with A. S. T. M. Specification C 62-41." Besides, Friedman contends that should it be held he is not entitled to recover of the Brick Company for the additional expense incurred by him in tearing down and replacing brick work wrongfully condemned by the Project Engineer representing the Government, and in purchasing higher priced brick in order to comply with the instructions of Johnson, who acted upon the wrongful condemnation, then he is entitled to recover for such additional expense of Johnson.

Johnson denied any liability to Friedman, assigning four reasons: first, Friedman by his contract agreed to assume the same obligation concerning the work, labor and material involved under the subcontract, as Johnson assumed in his contract with the owner (United States of America—Federal Public Housing Authority); second, Friedman failed to properly protect the brick from the elements; third, Friedman failed to comply with the terms of his contract in that he neither obtained a written order from Johnson for the extra work, nor informed him in writing of any claim as required by the contract; fourth, the substitution by Friedman of a more costly type of brick was his voluntary act and he is not legally entitled to the excess cost thereof.

The District Court concluded that the burden of proving that there was a breach of the warranty as to the quality of the brick furnished by the Brick Company rested upon Friedman, that this burden had not been met and that, therefore, the Brick Company is entitled to recover its claim against Johnson, the Surety Company, and Friedman. Friedman, Johnson and the Surety Company appealed.

The District Court also held that Johnson had breached his contract with Friedman, had been guilty of a wrongful act, and that Friedman is entitled to recover of him and his surety for the extra work and expense occasioned by the wrongful condemnation of the brick furnished by the Brick Company and Johnson's instructions to replace certain completed work and furnish brick in accordance with the specifications. Johnson and the Surety Company appealed.

We hold that the District Court correctly decided both controversies.

## Case No. 5437

While the formal contract between the Brick Company and Friedman was not completed until December 27, 1943, when Friedman returned to the Brick Company the contract signed in duplicate and requested the Brick Company to furnish Johnson a warranty that the brick to be delivered " * * * shall be new common brick made from clay or shale and comply with A.S.T.M. specifications C 62-41T, Grade NW", or, maybe, not until January 10, 1944, when the Brick Company actually furnished such warranty to Friedman and Johnson, it appears that negotiations were had between Friedman and the Brick Company as early as November or early December of 1943. The record discloses that on December 8, 1943, the same date on which deliveries under the con-

tract began, the Project Engineer, representing the National Housing Agency, Federal Public Housing Authority, wrote Johnson as follows: "In accordance with your letter of December 2, 1943, concerning samples of concrete units and brick submitted to this office, the same are hereby approved to be according to plans and specifications. Kindly furnish manufacturer's certificate of compliance with federal specifications as soon as possible."; also, strangely enough, that on January 12, 1944, Johnson wrote the Project Engineer as follows: "We submit herewith for your approval samples of brick to be used on the above projects. Also attached herewith are certifications by the manufacturers, Baltimore Brick Company, to the meeting of the A.S.T.M. specifications." The Project Engineer testified, in referring to the letter of January 12, 1944, from Johnson to him: " * * * It was strictly a typographical error. He did not submit any brick. I did not require any brick at that time." However, the record discloses a letter from the Project Engineer to Johnson, also dated January 12, 1944, in which he says, " * * * In connection with the above subject, samples of these bricks were approved by the undersigned 'to be according to plans and specifications' under date of December 8."

The evidence in this respect is very confusing and it is not possible to determine exactly what occurred, but it is definitely established by the evidence that insofar as Friedman is concerned the only evidence tending to prove a breach of the warranty that the delivered brick would come up to A.S.T.M. specifications is a test made for the Project Engineer by the Bureau of Standards subsequent to January 17, 1944, from which the Bureau found the compressive strength of three brick out of twelve delivered by the Brick Company to be below the allowable individual minimum of 2200 pounds per square inch. It is not seriously controverted if this test be accepted as determinative of the controversy that there was a breach of the warranty and that this question should be decided in favor of Friedman, but the circumstances indicate that this test should not be accepted as determinative.

It is to be noted that the Specifications for Building Brick adopted by the American Society for Testing Materials, which is identical with the A.S.T.M. specifications, etc. referred to in the warranty and likewise in the specifications for the construction of the project, contain the following prescribed method for sampling and testing: "Fig. 5(a) For purpose of tests, brick that are representative of the commercial product shall be selected by a competent person appointed by the purchaser, the place or places of selection to be designated when the purchase order is placed. The manufacturer or the seller shall furnish specimens for tests without charge." Notwithstanding this provision, the purchaser, the government, and the manufacturer, as well as Friedman, saw fit to proceed otherwise and the only test made for the purpose of determining the quality of the brick and whether they complied with the A.S.T.M. requirements was made not with brick selected by a competent person appointed by the purchaser, nor with brick selected at the place or places designated when the purchase order was placed, as provided in the above-quoted provision, but with brick selected by the Project Engineer, the representative of the government, which brick were selected by him from places chosen by him not when the purchase order was placed, but on January 15, as the Project Engineer testified, which was more than a month after the purchase order was placed and after the selected brick had lain exposed to winter weather with alternate freezing and thawing for at least twenty days and probably longer.

■■ As set out in the opinion of the able Judge who heard this case in the District Court: " * * * These samples were taken from a pile that had been lying out in freezing winter weather for a considerable period of time, with many surfaces exposed that would not have been so exposed after being put in place in the buildings. Furthermore, the testimony is rather vague as to just what part of the piles these samples were taken from. All of them met all of the requirements of the A.S.T.M. tests except three, which, as has been stated, fell somewhat short of the minimum compressive strength requirement." It is clear from the evidence that the brick selected for the test had been exposed to bad weather conditions and likewise that brick so exposed tend to deteriorate and lose compressive strength, therefore it appears to us that the test which was made was not a fair one and that the probative force of it, when considered together with evidence of tests made by the Brick Company, is not suf-

ficient to carry the burden imposed by law upon the purchaser to prove by a preponderance of evidence that there was a breach of the warranty as to quality. That the burden rested upon the purchaser as a matter of law is a settled principle. Nicholson v. American Hide & Leather Co., 307 Mass. 456, 30 N.E.2d 376; Wood Motor Car Co. v. Tobin, 120 N.J.L. 587, 1 A.2d 199; Gay Sullivan & Co. v. Glaser, Crandell Co., 7 Cir., 102 F.2d 149; Eckels v. Cornell Co., 119 Md. 107, 86 A. 38; 48 Am.Jur. Sec. 309; 55 C.J. 837.

In reaching the conclusion that the proof was insufficient to show a breach of warranty on the part of the Brick Company, the District Judge said:

"* * * We are not willing to say that this analysis sufficiently meets the burden of proof imposed upon the subcontractor in order to satisfy the charge of breach of warranty. It is true, of course, that it may be said that if the subcontractor should have resorted to the form of procedure when the bricks were first delivered and made certain of the quality of the bricks, by the same token, the Brick Company should have insured itself against a claim of the present sort by giving definite proof that this particular lot of bricks had been tested in order to see whether it met the required standards. But as respects the present claim, the burden of obtaining the analysis rested upon the purchaser. He should not have rested content without it. He waited for the Government to act, and the Government in its turn was negligent. The Brick Company did not deceive the subcontractor.

"It is further true that the only analysis put in by the Brick Company related to samples taken from its own plant and tested just a few days ago; also that while those samples, tested by a local, well-known firm of chemical engineers and analysts of high repute, indicate that all of the requirements of the A.S.T.M. standard have been met, it may be said that there is no absolute certainty in the evidence that these samples were identical with the brick that were actually delivered. On the other hand, the proof is uncontradicted that for years this company, well established in Baltimore in the manufacture of brick, with a wide distribution of its products, had been carrying on a standard form of brick manufacture at both of the plants from which the bricks here involved were taken, and that its samples were taken from the kiln, from the same general lot or lots from which the bricks were delivered to the present subcontractor, so there is a lack of any convincing proof that we should not treat them as being of the same character and condition. These samples, analyzed for the Brick Company, were taken under conditions which we believe are the conditions which are impliedly called for by the specifications, whereas the samples taken and analyzed on behalf of the subcontractor were taken under conditions which, from the testimony in the case, may have altered very materially the condition of the brick, i. e., put them in a state of absorption with vastly more water content and, therefore, changed their compressive strength very much more than we are prepared to say would have been true had samples been taken and tested at or about the time the bricks were delivered.

"It is for these reasons that the Court feels that the subcontractor has failed to sustain the burden of proof that rests upon him in alleging a breach of warranty in a suit of this kind."

The reasoning and conclusion set forth in this statement are supported by the evidence and we find no error in either.

### Case No. 5438

We come, secondly, to consider the District Court's holding that Friedman is entitled to recover from Johnson his added expense in tearing out installed brick work and in furnishing brick better and more expensive than he was required to furnish under his contract, that is, Grade M brick, such added expense, as Friedman insists, having been made necessary by the wrongful condemnation and rejection of the Baltimore Brick Company brick and the wrongful instruction of Johnson.

By stipulation below, evidence before the Court in the controversy between the Baltimore Brick Company and Friedman and Johnson became a part of the record in the controversy between Friedman and Johnson and is substantially the only evidence with respect to the quality of the brick and the alleged breach of the warranty as to quality. The District Court held in each controversy that there was no breach of warranty. We approve this holding, which is equivalent to a finding that the Baltimore Brick Company brick measured up to the specifications, that

Friedman in this respect complied with his contract with Johnson, and that, therefore, the condemnation and rejection by the Project Engineer and the instruction of Johnson to Friedman based thereon was wrongful and in violation of Friedman's rights. The principal question to be determined in this controversy is: Can Friedman recover for his added expense which unquestionably resulted from such wrongful acts of the Project Engineer and Johnson, or is the right of recovery denied by reason of the terms of the contracts between Friedman and Johnson and between Johnson and the Government?

■ Before passing to this principal question, we take note of the objections made below to certain evidence of tests offered by the Baltimore Brick Company which were made respectively in 1936, several years before the date of the controversies, and in 1945, eleven months after the last delivery of brick to Friedman. We think the cases cited by Johnson fail to sustain his contention as to the competency of these tests. We quote again the opinion of the District Judge in Case No. 5437: " * * * On the other hand, the proof is uncontradicted that for years this Company, well established in Baltimore in the manufacture of brick, with a wide distribution of its products, had been carrying on a standard form of brick manufacture at both of the plants from which the brick here involved were taken, and that its samples were taken from the kiln, from the same general lot or lots from which the bricks were delivered to the present subcontractor, so there is a lack of any convincing proof that we should not treat them as being of the same character and condition. These samples analyzed for the Brick Company were taken under conditions which we believe were the conditions which were impliedly called for by the specifications, whereas the samples taken and analyzed on behalf of the subcontractor (the Project Engineer) were taken under conditions which, from the testimony in the case, may have altered very materially the condition of the brick, i. e., put them in a state of absorption with vastly more water content and, therefore, changed their compressive strength very much more than we are prepared to say would have been true had samples been taken and tested at or about the time the brick were delivered." We believe that any objection to this testimony goes to its probative force rather than to its competency.

We will briefly and chronologically state certain facts which are either undisputed or established by the weight of the credible evidence, as found by the District Judge. Two contracts are involved, the one between the Government agency and the contractor, of which the written specifications are made a part, the other between the contractor, Johnson, and the subcontractor, Friedman, to which the Government is not a party, but which provides in substance that the subcontractor assumes towards the contractor all the obligations which the contractor assumes towards the Government, and that he, the subcontractor, will do the work agreed upon in entire accordance with all the provisions of the contract between the Government and the contractor. On December 2, 1943, subsequent to the execution of both contracts, Johnson submitted to the Project Engineer, who represented the Government, samples of brick acquired by Johnson from the Baltimore Brick Company and such samples were approved to be according to plans and specifications. On January 12, 1944, Johnson sent the Project Engineer further samples and a sworn certificate of the Brick Company that the brick met the specifications, but no analysis had been made in fact in compliance with the A.S.T.M. specifications requiring tests to be made at a place selected when the purchase order is placed with samples selected by a competent person appointed by the purchaser at the place or places then chosen. On January 22, 1944, the Project Engineer wrote Johnson that the brick were condemned because, although originally approved by his office, " * * * A recent report by the Bureau of Standards indicates that 25 per cent of these brick do not meet the crushing strength test." Thereafter, Johnson informed Friedman of the Project Engineer's action and instructed him to take immediate steps to supply brick meeting the specification requirements and otherwise carry out the instructions of the Project Engineer, which instructions included the tearing out of certain work which had been completed. Johnson made repeated requests of the Project Engineer for a copy of the analysis made by the Bureau of Standards, but this was not received until the following June. Johnson then sent a copy of the analysis to Fried-

man, and on September 14 Friedman made a formal written claim against Johnson and stated: "In order to protect ourselves, inasmuch as we are in the middle and innocent in any event, whether the Government be right or wrong, we are obliged to and do hereby make full claim against you for $8,742.50, in accordance with statement enclosed. It is our suggestion that to protect yourself against the eventuality, you make claim against the U. S. Government so that when this matter is finally determined the responsibility will then lay with the United States for improperly rejecting the brick, or with the Baltimore Brick Company for furnishing improper brick." Johnson presented Friedman's claim to the Government, in accordance with Article 15 of the General Contract and the claim was rejected. The thirty day period following the rejection allowed for an appeal to the Housing Authority by Johnson had not expired when the case was heard in the District Court, but Johnson had agreed to take the appeal in due course and had asked the assistance of Friedman in prosecuting it.

But Friedman asserts that he is not to be bound by the results of such appeal and is not required to await its outcome before prosecuting his claim in the present suit. The District Court concluded that both positions are sound and we agree.

■ The pertinent portions of the two contracts are lengthy and we will not undertake to quote them. We think it sufficient to quote the interpretation of the District Judge as to how the respective parties were obligated; "The contractor was obligated to select his own samples when he ordered the brick from the subcontractor, and to test them, and if he failed to take advantage of this right given him under the specifications, he assumed the risk of not being able, at a later date, to substantiate a claim that the brick was sub-grade when purchased; (2) the subcontractor had the right to assume that the contractor would either insist upon the method of sampling for tests given him by the specifications, or if he saw fit not to do so, would run the risk incident thereto; and (3) the Government, as respects sampling, was placed under the same obligation in its relation with the contractor that the latter was in his relations with the subcontractor, even though the Government may not have been a purchaser of the brick in the same sense, and if the Government did not see fit to do its part under the specifications it assumed the resultant risk." The obligation of Johnson as to making tests was the same as that of Friedman in his contract with the manufacturer, because he was committed to the requirements of the same specifications and as between himself and Friedman, Johnson was the purchaser and was required to select the samples at the time of the purchase. He failed to do this, and as noted by the District Judge, Friedman had a right to treat this failure and the subsequent use of the brick as a waiver of this initial requirement and therefore, just as Friedman failed to prove any breach of warranty on the part of the manufacturer, Johnson has made a similar failure as respects Friedman, and Johnson has no legal ground for saying that he is not responsible to Friedman for the direct and natural consequences of his wrongful act in requiring Friedman to tear out completed work and furnish a better and more expensive brick than called for by the specifications.

■ As stated above, the counsel for Johnson give four reasons why, as they contend, Johnson should not be required to compensate Friedman for his added expense:

1. That Friedman, by his contract, agreed to assume the same obligation concerning his work as Johnson assumed in his contract with the Government; and agreed to be bound by all rulings and requirements affecting the same. As no question has been raised as to the character of the workmanship performed by Friedman and as it now appears that the brick furnished by him measured up to the specification, it would seem that as between Friedman and Johnson, Friedman has met the obligations which he assumed under the contract and while, generally speaking, Friedman might be held bound by the rulings and requirements of the Project Engineer, we hold, as was held in the Court below, that under the circumstances Friedman is not bound by the act of the Project Engineer in rejecting the brick now found to measure up to the contract requirements because neither the Project Engineer nor Johnson proceeded under the contract to exercise the right of conclusive decision provided by the contract. The fact is that the Project Engineer representing the Government failed to comply with the specifications which it

imposed upon the contractor and by which the Government agreed to be contractually bound. As put by the counsel for Friedman in their brief, the question is: "Can the Government, after its failure to sample for test purposes, according to contract, later take a sample and test and then exercise its contractual right of conclusive decision?" The District Judge gave the answer to this question in the following language: "* * * Had the Project Engineer on his part fulfilled the requirements of the specifications as to testing the brick and even though such tests showed the brick to be up to the required specifications, if, after they had been put in place, the Project Engineer saw fit to reject them and to require a better grade, provided such rejection was not fraudulent or lacking in honest judgment, his discretion would control because this would be a question of fact within the discretion of the Project Engineer and his decision is made final, as we have seen, in such cases, subject only to an appeal to the Housing Authority, with claim for additional work. But in the present case, we have a breach of performance on the part of the Project Engineer in advance of that state in performance under the contract which matters to the discretion of the Project Engineer. Therefore, while the question of the liability of the Government to the contractor is not now before us, and whatever may be the Government's defense to the breach of performance on the part of the Project Engineer, we find, for the purpose of the present suit, that such breach did occur and that the contractor cannot successfully avoid liability to the subcontractor in the face of this breach, any more than he can avoid liability because of his own similar breach."

■ 2. Johnson insists that Friedman did not properly protect the brick from the elements and for this reason is not entitled to recover of Johnson. It is to be noted that the District Judge made no comment in his opinion with respect to this contention; such fact leaves the impression that the contention was not seriously pressed below; however, we cannot say that there was error in failing to find such fact and the truth is that the record seems to disclose that while the brick probably deteriorated between delivery and the date of the selection of the 12 brick for the test, such deterioration, if it in fact occurred, should not be attributed to neglect on the part of Friedman. Friedman testified that: "* * * When the brick are dumped we protect them with canvass covers, as many as we have for those buildings that we immediately work on." He also testified that sometimes he did not have enough canvas to cover all of the brick, but that it was not the normal practice for a masonry contractor to protect his own brick. The sole evidence upon which Johnson asserts that the Court should have found Friedman in breach of his contract for failing to protect the brick is the statement of the Project Engineer to the effect that at the moment the samples were selected, the pile from which they were selected was not protected. To be sure, this statement standing alone is not sufficient to justify an affirmative finding that the suspected deterioration resulted from Friedman's negligence and breach of contract; in fact, it was admitted by the counsel for Johnson in the Court below that it would have been impracticable for Friedman to have kept all brick on hand covered and protected at all times. In this connection, it is helpful to note that at the outset both the Brick Company and Friedman believed Grade M brick, notwithstanding the Government's specifications, were not designed for exterior use in a climate like that of Jarboesville. This belief on the part of the Brick Company is evidenced by its letter of December 21, 1943 to Friedman, saying: "Please note this Company recommends against the use of Grade M brick for exterior purposes such as they are being used on your project. * * * It is our opinion that they are intended to be used only where the climate is mild and not where the wall is subjected to the alternate freezing and thawing as it is at Cedar Point (Jarboesville)." Friedman demonstrated his apprehension by making his contract with the Brick Company for both M and H brick, and in his testimony said: "I knew there was a possibility that the Government might change the M brick to H brick." Notwithstanding, the Government's specifications permitted the use of M brick generally on the project, samples were approved and no objection was raised until more than a month after the approval of the samples and the initial delivery of M brick under the contract. We think the proof tends to show more clearly that M

brick were not designed for general use on this project and that there was a mistake on the part of the Government agent in preparing the specifications than it does that any deterioration of the brick sampled resulted from Friedman's failure to afford proper protection.

3. The third reason advanced by Johnson as a bar to recovery by Friedman is that he failed to comply with the terms of Article 8 of his subcontract. The pertinent part of this Article reads as follows: "The party of the second part shall make no claim for additional work unless the same shall be done in pursuance of written order from the party of the first part, and notice of all such claims shall be made to the party of the first part in writing before the next ensuing payment, or shall be considered as abandoned by the party of the second part." We hold with the counsel for Friedman and in accordance with Judge Coleman's opinion that the provisions of this Article have no " * * * application to the present controversy because they clearly appear to relate to extra work, that is, work not within the express or reasonably implied scope of the specifications agreed upon at the time that the two contracts were made."

4. Lastly Johnson contends that the act of Friedman in substituting H brick was his voluntary act and that he is not legally entitled to the excess cost thereof. It is true that Friedman was not instructed to substitute the H brick, but it is equally true under the undisputed evidence that he was forced to use the H brick in order to comply with the instructions of the Project Engineer, as the only source of supply of M brick was the Baltimore Brick Company, whose M brick had been rejected and condemned by the Project Engineer. Friedman testified, and what he said is not disputed, that the only concern that made an M brick in the territory was the Baltimore Brick Company and that the next best brick he could get happened to be the H brick; that he made an effort to get M bricks from other sources without success. As stated, this line of testimony is not disputed and we must assume that Friedman, who was required by his contract to follow the instructions of the contractor and the Project Engineer or run the risk of having his contract terminated for failure to do so, did the best he could under all of the circumstances.

The question of any liability of the Government to Johnson is not before us and, therefore, no opinion is expressed in this regard except to say that we do not intend to suggest by anything herein that Johnson may not have such right of action against the Government to recoup the damages which he is required to pay to Friedman hereunder.

Under the contracts Friedman could make no claim against the Government. There was no contractual relationship to support such claim and in the contract between Friedman and Johnson it is provided that Friedman " * * * shall not deal directly with the representatives of the owner (the Government), but shall handle all matters connected with this contract, the work or the furnishing of the materials, exclusively through the party of the first part (Johnson) unless otherwise directed in writing by the first party." In this situation Friedman seasonably made his claim to Johnson on September 14, 1944 and in the letter submitting claim Friedman suggested to Johnson that he make claim against the Government, " * * * so that when this matter is finally determined the responsibility will then lay with the United States Government for improperly rejecting the brick, or with the Baltimore Brick Company for furnishing improper brick." There is no disagreement as to the amount due from Johnson to Friedman if, in fact, any amount be due, and no objection had been raised by either the Government or Johnson as to the workmanship of Friedman; and on the facts admitted or established by the evidence we hold, in the words of the District Judge, " * * * that it would be inequitable and contrary to a proper construction of the contracts to deny relief to the subcontractor."

Both judgments are affirmed.

Affirmed.