W.F. MAGANN CORPORATION, a
Virginia Corporation, Appellant,

v.

DIAMOND MANUFACTURING COMPA-
NY, INC., d/b/a Marine Constructors, a
Georgia Corporation and Aetna Casual-
ty and Surety Company, A Connecticut
Corporation, Appellees,

v.

W.F. MAGANN CORPORATION and
Aetna Casualty and Surety
Company, Appellants.

United States of America,
Amicus Curiae.

No. 84–1275.

United States Court of Appeals,
Fourth Circuit.

Argued Feb. 5, 1985.

Decided Oct. 22, 1985.

G. Dana Sinkler, Charleston, S.C. (Sinkler, Gibbs & Simons), Charleston, S.C., W. Stanfield Johnson, Peter F. Garvin, III (Crowell & Moring) Washington, D.C., on brief for appellants.

A. Camden Lewis, Columbia, S.C. (Keith M. Babcock, Lewis, Babcock, Gregory & Pleicones, Columbia, S.C., on brief), for appellees.

Richard K. Willard, Acting Asst. Atty. Gen., Washington, D.C. (Elsie L. Munsell, U.S. Atty., Alexandria, Va., Stephanie J. Grogan, Dept. of Justice, Washington, D.C.) for amicus curiae.

Before PHILLIPS and WILKINSON, Circuit Judges, and KISER, United States District Judge for the Western District of Virginia, sitting by designation.

KISER, District Judge.

This appeal arises out of a contractual dispute over the dredging of the Murrell's Inlet Project ("Project") in Murrell's Inlet, South Carolina. Plaintiff-Appellant W.F. Magann Corporation ("Magann") brought suit against Defendant-Appellee Diamond Manufacturing Company ("Diamond") for breach of a subcontract. Diamond counterclaimed under the Miller Act, 40 U.S.C. § 270a–d. The case was tried before Judge Falcon B. Hawkins, United States District Judge for the District of South Carolina without the assistance of a jury. Judge Hawkins held that Magann breached the contract and that Diamond was justified in rescinding the contract. As a result, the Court, 580 F.Supp. 1299, held that Diamond was entitled to damages measured in *quantum meruit*. Magann appeals this decision.

I.

Magann, a Virginia corporation, entered into a contract with the United States Army Corps of Engineers to construct a protective jetty system and to dredge the navigational channels at Murrell's Inlet, South Carolina. Magann subsequently entered into a subcontract with Diamond of Savannah, Georgia, to complete all the dredging aspects of the Project. Diamond agreed to perform the dredging in accordance with the design specifications which

were incorporated into the subcontract. Work began on the Project, and it soon became evident that it was necessary for Diamond to dredge considerably more material than that for which it was being paid. Payment on the Project was to be made according to before-and-after surveys of the areas dredged. Thus, the dredged areas holding on the slopes required under the contract were particularly relevant to payment. There was erosion and shoaling in the dredging almost immediately, and the material would not hold on the 1 vertical on 4 horizontal slope required by the specifications. Magann was informed of this problem by Diamond on December 11, 1978 and notified the Corps on the same date.

Diamond continued to work on the Project and to press its claims for additional payments due for overdredging. The final phase of the Project was the dredging of the Deposition Basin. In order to complete this phase in accordance with the specifications, it was necessary for Diamond to design and construct a booster pump. Magann and the Corps requested an additional plan of operation from Diamond with regard to the use of the booster pump before allowing them to proceed. Diamond did not submit the required plan and refused to resume work until all of its claims for payment were satisfactorily resolved. Following this standoff, Diamond was terminated, and Merritt Construction was hired to complete the final dredging. Magann then filed this action for breach of the subcontract. Diamond counter-claimed under the Miller Act, 40 U.S.C. 270a–d, alleging *inter alia* defective specifications, changed conditions, differing site condition and refusal of Magann to actively press for resolution of the payment claims.

The District Court found that Magann breached the subcontract and that Diamond was justified in rescinding it. The Court then held that Diamond was entitled to damages measured on a *quantum meruit* basis. In reaching the conclusion that Magann breached the contract, the Court focused on several factors. The major areas of concern were the defective specifications and differing site conditions. The District Court found that the Project was exhaustively studied by the Corps of Engineers prior to bidding and that the conclusions of the study were incorporated into a "General Design" Memorandum. This document, which the District Court concluded was the basis for the plans and specifications of the Project, was never made available to the subcontractors prior to bidding. In fact, it was noted by the District Court in its opinion that the existence and content of the Design Memorandum was only discovered after one full year of discovery in preparation of trial.

The District Court held that had this information been made available it would have revealed that maintenance of the Inlet Channels by dredging alone, without structural protection, would be impossible. Based upon this information, the District Court concluded that Diamond would have insisted on the jetty system being in place prior to the dredging of the Auxiliary Channel. The Memorandum does reveal that several different alternatives were considered for improving the navigation of Murrell's Inlet. One of the options considered was dredging *without any* structural protection. The Memorandum concluded that past experience in Murrell's Inlet proved that dredging alone was inefficient in achieving desirable navigability. Furthermore, the Memorandum indicated that at the time of the study that the technology did not exist in the commercial dredging industry to complete and maintain the project through dredging alone and that the "design of a pipeline dredge renders it useless in areas of strong wave actions." Pr. 28, p. 8, General Design Memorandum. The significance of this information in this controversy was that Diamond utilized a pipeline dredge and that the order of work contemplated initial dredging prior to the completion of both jetties and also required continuous maintenance dredging of an existing navigational channel and Pilot Channel regardless of the order of work. In addition, Diamond requested and received a work order change

to allow dredging in the auxiliary and Pilot Channels prior to completion of the jetty system. Had the information in the Design Memorandum been made available to Diamond, it would have known that dredging in the Inlet without structural protection would result in a significant amount of overdredging and would have adjusted to these conditions.

A second area of concern was the fact that the specifications for the project proved to be defective. The District Court found that the Corps of Engineers misclassified the type of material to be dredged on the Project as silty sand when in fact it was poorly graded sand which contained only minute quantities of fines and clays. The testimony indicated that the lack of silts and fines made the soil at the Project much less stable and more susceptible to erosion and shoaling; this resulted in the material not holding on the 1 vertical on 4 horizontal slope specified in the contract. This slope was not only required by the contract, but payment for the project was based on a before-and-after survey of the dredged areas that relied on the slope. The Court held that Diamond was entitled to rely on these specifications and requirements.

The District Court concluded that due to the misclassification of sand and the failure to disclose the "Design Memorandum" that the specifications portrayed Murrell's Inlet Project as a standard and typical dredging project when, in fact, it was neither standard nor typical. Had the "Design Memorandum" and correct sand classification been made available, the District Court concluded that the infeasibility of the Project would have been known by Diamond. This information was never provided to Diamond.

Another area of concern arose out of the Corps' handling of Diamond's claim for a differing site condition. On December 11, 1978, Diamond gave notice to Magann of an unanticipated site condition and a changed condition. The record indicates that this was forwarded to the government contracting officer on the same day. The

"Differing Site Condition Clause" which was included in the General Provisions of the Construction Contract placed the burden on the Corps' contracting officer to investigate the alleged conditions. The Court concluded that the Corps made no effort to conduct such an investigation, but only recomputed its figures which offered no insight into the genesis of the problem. According to the Court, Diamond continued to press its claims of overdredging, and the Corps did not pursue its obligation to investigate the claims. The District Court concluded that all of these various problems resulted in the inevitable conclusion that Magann had breached the contract. While the District Court acknowledged that the loss probably should fall upon the Corps of Engineers and that it was in all probability responsible for the breach, the Court citing *John A. Johnson & Sons, Inc. v. United States*, 153 F.2d 534 (4th Cir.1946), *cert. denied*, 328 U.S. 865, 66 S.Ct. 1372, 90 L.Ed. 1636, held that Magann as general contractor was responsible for the actions of the Corps as well as its own.

■ On appeal Magann sets forth numerous grounds for reversing the lower court's decision. Essentially, Magann asserts that the District Court erred in finding that it breached the contract and that Diamond was entitled to *quantum meruit* damages on the work performed. It is not the task of this Court to reweigh all the evidence which was presented to the District Court. While we are not prohibited from reviewing the lower court's findings of fact, we are limited to considering whether the findings of the District Court were "clearly erroneous". *Colbertson v. Jno. McCall Coal Company, Inc.*, 495 F.2d 1403 (4th Cir.1974). "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *U.S. v. U.S. Gypsum Company*, 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948).

■ After a careful review of the rather voluminous record in this case, we cannot

say that the District Court's findings were clearly erroneous nor that the Court's legal conclusions require reversal. While the District Court focused on several factors which would justify the conclusion that Magann breached the contract, the defective specification was the most troublesome element. The District Court's reliance on *Helene Curtis Industries, Inc. v. U.S.*, 312 F.2d 774, 160 Ct.Cl. 437 (1963) and *Eastern Services Management Co. v. U.S.*, 243 F.Supp. 302, 304 (E.D.S.C.1965) for the proposition that the failure to furnish adequate specifications possible of performance is a breach of contract is well-founded. While it is true that reliance on the defective specifications is important and that the opinion does not specifically refer to this element, we believe that it is implicit in the opinion that Diamond relied on specifications and information provided when formulating its bids and that it was misled. Furthermore, the District Court's conclusion that Magann is also responsible for the actions attributable to the government contracting officer is also correct. *See John A. Johnson & Sons, Inc., supra.* We cannot say that the District Court's findings that the sand was misclassified and the specifications were defective are clearly erroneous. There is evidence in the record to reflect the fact that the soil borings were indeed misclassified and that this, in combination with the failure to disclose the salient information in the Design Memorandum regarding the peculiarities of Murrell's Inlet, prevented this from being a standard dredging contract. As such, we believe the record supports the Court's conclusion that the specifications were defective, that Diamond relied on these defective specifications, that the government formulated the specifications, and that Magann, as general contractor, is also responsible for the government's errors. Based upon these findings, we believe the record supports the District Court conclusion that the contract was indeed breached by Magann.

■ Magann argues that Diamond should have been required to exhaust its administrative remedies before proceeding with this present action. Magann submits that they were advocating Diamond's claims for additional payment before the government contracting officer when Diamond was terminated, and Magann actually appealed the contracting officer's decision to the Contracting Board of Appeals on Diamond's behalf. In essence, Magann asserts that the administrative process of resolving this claim was ongoing and that the claims for differing site condition were being actively pursued and that Diamond's action for damages should have been stayed until the conclusion of the administrative process. Notwithstanding this fact, the record below is clear that on two occasions Diamond moved the District Court to stay the judicial proceedings pending the resolution of the dispute by the Board of Contracting Appeals.[1] These motions were denied. Diamond asserts that Magann opposed the efforts to stay the proceedings. This fact is undisputed by Magann and the record before us would indicate this to be accurate. As such, Magann cannot be heard to complain now that the matter should properly have been resolved through the administrative process.

## II.

Magann also objects to the amount of damages awarded in this action on a *quantum meruit* basis. In awarding damages, the District Court relied upon *U.S. v. Algernon Blair, Inc.*, 479 F.2d 638 (4th Cir. 1973), wherein the Court held that when a prime contractor breaches the contract and continues to receive the benefits of the services provided by the subcontract that the subcontractor is entitled to *quantum meruit* damages. The District Court held that Diamond had proven its total cost, including overhead and profit. This amount was $3,069,421.48 and after payments were credited a balance of $1,570,-

---

**1.** Diamond moved for a stay of judicial proceedings on February 2, 1982, and November 15, 1982. The Court denied the stays.

074.18 was still due. In the Opinion below, the District Court itemized the various costs which made up the damage award.[2] Two of the items (profits and booster pump rental) were singled out by the Court for special attention. We agree that these specific elements do merit further consideration.

Profits awarded by the District Court to Diamond in the amount of $400,359.32 were calculated at a rate of 15% of the subtotal of $2,669,062.16. In support of the award of profits under a *quantum meruit* theory, the District Court cited the following cases: *U.S. for the use of Reichenbach v. Montgomery, et al,* 155 F.Supp. 384 (E.D.Pa. 1957); *Continental Casualty Co. v. Schaefer,* 173 F.2d 5 (9th Cir.1949). We feel these cases are distinguishable from this case,[3] and in any event we do not believe that this accurately reflects this circuit's view on *quantum meruit* recoveries.

The precise question to be decided is whether profits, as such, are recoverable under a *quantum meruit* theory. The leading Fourth Circuit case on this point is *United States for the Use of Coastal Steel Erectors, Incorporated v. Algernon Blair, Incorporated,* 479 F.2d 638 (4th Cir.1973), which was cited in the District Court Opinion in support of allowing Diamond to recover on a *quantum meruit* theory. In *Blair,* the breaching party sought to reduce the amount of the damage award by showing projected losses that the plaintiff would have sustained had it completed the contract. In rejecting the defendant's theory, we stated:

> Impact of *quantum meruit* is to allow a promisee to recover the value of services he gave to the defendant irrespective of whether he would have lost money on the contract.

*Blair, supra,* at 641.

> The measure of recovery for *quantum meruit* is the reasonable value of performance. Restatement of Contracts 2d, § 347 (1932).

*Id.*

The rationale of *Blair* which denies the diminution of a *quantum meruit* damage award due to projected contract losses should be equally applicable in denying an enhancement of the award by adding projected profits thereto.

■ A leading commentator on contracts has explained the underlying principles of a *quantum meruit* recovery as follows:

---

**2.** The District Court's award of damages was based on the following:

| | |
|---|---|
| Direct Labor | $1,152,985.15 |
| Fuel Oil | 255,556.59 |
| Parts & Materials | 192,792.26 |
| Repairs | 137,159.13 |
| Materials & Overhead | 43,913.10 |
| Operations | 172,947.77 |
| Equipment Rental | 396,000.00 |
| General Administrative Overhead | 197,708.16 |
| Booster Pump Rental | 120,000.00 |
| Subtotal | $2,669,062.16 |
| Profit at 15% of Subtotal | 400,359.32 |
| TOTAL | $3,069,421.48 |

**3.** In *Reichenbach v. Montgomery,* 155 F.Supp. 384 (E.D.Pa.1957), a subcontractor alleged that the subcontract had been modified by a partially written and partially oral supplement wherein the subcontractor agreed to provide additional labor and materials for a specified sum. The general contractor, on the contrary, argued that the changes in the contract were fewer than those alleged by the subcontractor and that payment was to be made on a *quantum meruit* basis. The jury found for the subcontractor. The Court reasoned that "it must be concluded that the subcontract was changed to provide for the additional work and at the additional price alleged by the subcontractors." *Id.* at 385. Thus, the award for profits was not on a *quantum meruit* recovery, but rather it was as part of the contract. The District Court also points to the case of *Continental Casualty Co. v. Schaefer,* 173 F.2d 5 (9th Cir.1949), in support of the profit award. The Ninth Circuit looked to the law of the State of Washington in concluding that profits were an appropriate element of recovery in *quantum meruit.* While profits were allowed, *Continental* involved a situation where the subcontractor continued to perform work *outside* of the contract on the basis of oral representations and inducements made by the general contractor. This situation is distinct from the present one in that the contract work became more burdensome as a result of unanticipated conditions rather than extra work outside of the contract.

One who has rendered a service or supplied work, labor and materials under a contract with another, but who has been wrongfully discharged or otherwise prevented from so fully performing as to earn the agreed compensation, may regard the contract as terminated and get judgment for the reasonable value of all that the defendant has received in performance of the contract.

5 *Corbin on Contracts*, § 1109, p. 581.

By giving judgment for restitution of the value received by the defendant, the Court is trying to put the plaintiff in a position as good as that occupied by him before the contract was made, at least so far as that result will be brought about by requiring the defendant to pay the reasonable value of what he may have received from the plaintiff by way of partial performance.

5 *Corbin on Contracts*, § 1112, p. 596. The underlying purpose of allowing *quantum meruit* recovery is two-fold, i.e. to prevent the breaching party from being unjustly enriched and to restore the aggrieved party in the contract to the position he occupied prior to entry into the contract. *Quantum meruit* merely seeks to return to the plaintiff the reasonable value of the services and goods provided to the defendant.

"The standard for measuring the reasonable value of the services rendered is the amount for which such services could have been purchased from one in the plaintiff's position at the time and place the services were rendered.

*Blair, supra,* at 641.

 Thus, profits per se have no place in a *quantum meruit* recovery. They may be considered, however, to the extent that they may have a bearing upon assessing the reasonable value of the aggrieved party's performance. From the District Court's Opinion, we cannot tell whether the award of lost profit acted merely as enhancement of the damages or whether it

was a consideration in fixing the overall reasonableness of the value of the materials and services furnished by Diamond. Furthermore, the District Court did not make a precise finding as to the reasonable value of the services rendered by Diamond to Magann at the time that they were provided.[4] Since the District Court did not make such a determination, we deem it appropriate to remand this case to the District Court to determine whether it is necessary to award profits to Diamond and, if so, at what rate in order for Diamond to be reasonably compensated for the services and materials which were furnished to Magann.

 The second element of damages which the District Court specifically addressed and is challenged by Magann deals with the rental of the booster pump. This was valued at $120,000. As pointed out above, a threshold requirement for recovering *quantum meruit* damages is that the defendant receive the benefit of the plaintiff's performance. Otherwise, the defendant cannot be unjustly enriched. It is undisputed in this case that neither Magann nor the government ever received any benefit from the use of the pump. The record indicates that the pump was constructed for use in the final phase of the project; however, it was never used and Magann never received any benefit. Given this set of circumstances, this is not an appropriate element of *quantum meruit* damages. To allow recovery for rental of the pump is inconsistent with a *quantum meruit* recovery and must be denied.

Accordingly, this case is remanded to the District Court for a precise determination of the reasonable value of the services and materials provided by Diamond and for a determination of whether all or any portion of the profits awarded are necessary to reasonably compensate Diamond for the services and materials provided.

---

**4.** In *Blair,* the Fourth Circuit remanded to the District Court for a precise appraisal of the reasonable value of the service and materials

furnished. A mere approximation was deemed insufficient. *Blair, supra,* at 642, fn. 9.

*Affirmed* in Part and *Reversed* and *Remanded* in Part.