**W.F. MAGANN CORPORATION, a Virginia Corporation, Plaintiff,**

**v.**

**DIAMOND MANUFACTURING COMPANY, INCORPORATED, d/b/a Marine Constructors, a Georgia Corporation, and Aetna Casualty and Surety Company, a Connecticut Corporation, Defendants.**

Civ. A. No. 81–1149–8.

United States District Court,
D. South Carolina,
Charleston Division.

Jan. 14, 1988.

G. Dana Sinkler, Charleston, S.C., for plaintiff.

A. Camden Lewis, Columbia, S.C., for defendant, Diamond.

## ORDER

BLATT, Chief Judge.

This case comes before this court on remand from the Fourth Circuit Court of Appeals. The case arises out of a contractual dispute involving dredging of the Murrell's Inlet Navigation Project (Project) in Murrell's Inlet, South Carolina. W.F. Magann Corporation (Magann) brought suit against the dredging subcontractor, Diamond Manufacturing Company (Diamond), alleging breach of the subcontract, and Diamond counter-claimed against Magann in *quantum meruit* under the Miller Act, 40 U.S.C. §§ 270a–270d. The case was heard by Judge Falcon B. Hawkins, United States District Judge for the District of South Carolina, without a jury. Judge Hawkins found that Magann breached the contract and that Diamond was entitled to recover in *quantum meruit*. The Court of Appeals affirmed the lower court's holding on this liability issue, but remanded the case on the issue of damages "for a precise determination of the reasonable value of the services and materials provided by Diamond and for a determination of whether all or any portion of the profits awarded are necessary to reasonably compensate Diamond for the services and materials provided." *W.F. Magann Corp. v. Diamond Manufacturing Co.*, 775 F.2d 1202 (4th Cir.1985).[1] The facts of this case are set out in detail in the Fourth Circuit opinion, *id.*, and in Judge Hawkins' opinion *W.F. Magann Corp. v. Diamond Manufacturing Co.*, 580 F.Supp. 1299 (D.S.C.1984). Only those facts necessary to the *quantum meruit* claim are relevant, and such facts will be incorporated into the discussion of the measure of that claim.

---

1. Because Judge Hawkins' son is now associated with the firm that represents Diamond in this case, Judge Hawkins recused himself from the case on remand. The case was reassigned to this court on March 21, 1986.

## I. COURT OF APPEALS REMAND

This court allowed Magann and Diamond to brief their respective positions regarding the remand from the Court of Appeals. Magann contended that, in order to satisfy the Court of Appeals' mandate, this court could not rely on Judge Hawkins' "total cost approach," but must recalculate the reasonable value of Diamond's services. *Memorandum and Statement of Position for the Record of W.F. Magann Corp.*, at 5, received July 17, 1986.[2] Magann further contended that the Court of Appeals, in overruling the District Court's award of the costs associated with the booster pump, set forth, as a threshold requirement for any recovery of *quantum meruit* damage, that Magann had to have received the benefit of Diamond's performance. *Id.* at 5. Diamond, in opposition to Magann's position, argued that the case had been remanded only to determine if profits were properly awarded. *Memorandum in Opposition to Position of W.F. Magann*, at 2, received August 18, 1986. This court finds merit in Diamond's contention that Magann should have objected to the "total cost approach" at the trial court level. However, after oral argument on this issue on September 24, 1986, and because the Court of Appeals stated in its remand order that "a threshold requirement for recovering *quantum meruit* damages is that the defendant receive the benefit of the plaintiff's performance," *Magann*, 775 F.2d at 1208, this court has determined that it must review the entire record in order to calculate the reasonable value of the services and materials provided to Magann by Diamond and to decide whether profits are necessary to reasonably compensate Diamond for such services and materials. While this court found it unnecessary to reopen the already voluminous record, it required the parties to locate in the record the references to the value of the services and materials provided by Diamond to Magann.

## II. MEASURING THE VALUE OF THE SERVICES AND MATERIALS PROVIDED

As Magann correctly points out in its *Reply of W.F. Magann Corporation to Memorandum in Opposition Submitted by Diamond Manufacturing Company*, received October 27, 1986, Diamond has the burden of proof concerning its damages in a *quantum meruit* claim. *Morton v. Roanoke City Mills, Inc.*, 15 F.2d 545, 546 (4th Cir.1926). Diamond attempted to meet this burden by using two different methods of measuring the value of the services and materials rendered to Magann. The first method involves the "total cost approach" embodied in the Department of Defense Contracting Price Proposal, Form DD633 ("DOD form"), in the record as Diamond Exhibit 21. Record at 4996.[3] The second method involves calculations of the cubic yards dredged by Diamond during the Project. For the reasons discussed below, this court feels the "cubic yards dredged" method to be the most accurate in determining *quantum meruit* damages in this case.

### A. *DOD Form Method of Valuation*

Judge Hawkins based his award of damages on the DOD form. *Magann*, 580 F.Supp. at 1316. This form was marked for identification and admitted in evidence (R. at 1758) as part of Plaintiff's Exhibit 67 (R. at 3670), without any supporting testimony. The same form was also admitted (R. at 2404), with a December 30, 1980, cover letter from Donald E. Austin to Bill Magann, as Defendant's Exhibit 21. R. at 4997. Austin testified, as Diamond's President, that he had completed the form at Bill Magann's request. R. at 2403. Austin

---

**2.** All memoranda and replies, received after the remand of this case, are hereby filed as part of the record.

**3.** The record in this case will hereinafter be referred to as "R". The record has been bound as Record No. 84–1275, and is divided into three "Joint Appendix" volumes, two "Plaintiff's Exhibit" volumes, and two "Defendant's Exhibit" volumes. Because all seven volumes are numbered consecutively, this court will use the page numbers of the bound volumes to refer to the record in this case.

also explained the form, (R. at 2405–10), and Daniel DeLoach, one of Diamond's accountants, testified about the sources for, and accuracy of, the figures included in the form. R. at 2519–534. The figures on the DOD form were not directly contested at trial.[4] However, as Magann points out in its *Memorandum of W.F. Magann Corp.* *Concerning the Proper Measure of Quantum Meruit Recovery*, received October 24, 1986, there is evidence in the record which proves that some of the costs claimed on the DOD form are unrelated to services and materials provided to Magann. The following is a comparison of the disputed figures:

| | Diamond (DOD form)[5] | Magann (Oct. 24, 1986 and Jan. 6, 1987 memos) |
|---|---|---|
| Labor | 1,152,985.15 | 678,279.94 |
| Fuel | 255,556.59 | 215,037.15 |
| Parts | 192,792.26 | 125,663.51 |
| Repairs | 137,159.13 | 35,823.92 |
| Material | 43,913.10 | 28,239.34 |
| Overhead Operations | 172,947.77 | 101,741.99 |
| Overhead Equipment | 396,000.00 | 396,000.00 |
| Rental Admin. | 197,708.16 | 126,462.82 |
| | 2,549,062.16 | 1,707,248.50 |

An example of the difficulties of using the DOD form approach, with the record in this case now before this court, is found in the cost-of-labor calculations. Diamond's total labor cost claim is $1,152,985.15. This claim is supported by a document labelled "Schedule A," which is found in the record at pages 4997 and 3672. Although "Schedule A" lacks any headings or other identification, the court could find, through computation and in reliance on Magann's memo received October 24, 1986, that the first three columns represent "Direct Labor," "Fringe Benefits," and "FICA" costs, and that the total of these three columns, including supervisory personnel costs and preparatory labor costs, equals $1,153,-185.15. There is a difference of $200.00 between this sum and the claimed amount.[6] Because the underlying document is generally the better source, this court would, if adopting this method, probably work from the $1,153,185.15 sum. Daniel DeLoach, Diamond's accountant, testified that the direct labor figures came from a computer payroll (R. at 2520), which this court could assume was incorporated into the figures on "Schedule A." The figures are, however, broken down into dates which do not correspond to the time periods when Diamond was at work on the job. Diamond's expert, Dr. Gregory Richardson, among

---

4. In the record at page 2404, Mr. Sinkler, for Magann, did not object to the admission of the exhibit as something Austin sent to Bill Magann; however, Mr. Sinkler did not agree to the accuracy of any of the figures. Mr. Lewis, for Diamond, rejoined, "I don't think anybody agrees with the accuracy of the figures."

5. Excludes $120,000.00 for "Booster Pump (construction)" and $400,359.12 for "Profit." The Court of Appeals found that the booster pump was not "an appropriate element of *quantum*

*meruit* damages" because "it was never used and Magann never received any benefit." *Magann*, 775 F.2d 1208. Profits as discussed by the Court of Appeals, *id.* at 1207–08, cannot be incorporated into this valuation unless the threshold requirement, that Magann received the benefit of Diamond's services, is satisfied.

6. The difference lies in this court's summation of the "Direct Labor" column.

others, testified that Diamond's dredging activity in Murrell's Inlet began September 20, 1978.[7] R. at 2797, 5148. Richardson's summary, (R. at 5448), shows that Diamond dredged Phase I of the Project from September 20, 1978, to January 3, 1979. From January 3, 1979, to May 1, 1979, the dredge was "idle at dock." During Phase II, Diamond dredged from May 1, 1979, to June 23, 1979, and then remained "idle at dock" from June 23, 1979, to February 3, 1980. The Final Phase dredging lasted from February 4, 1980, to June 4, 1980. R. at 5148.

■ The problems with the DOD Form method of valuation are evident from the foregoing paragraphs. Diamond claimed costs for periods of time when it was not dredging. There appears to be no other benefit conferred by Diamond upon Magann other than dredging and the demobilization and mobilization concurrent therewith. To evaluate the benefit claimed, this court is required to make assumptions and calculations involving evidence to which there was no objection, and hence was not the subject of detailed testimony. This court decided not to reopen the record, and so it has not allowed Diamond to produce reasons for justifying its costs as submitted on the DOD form; nevertheless, in response to Magann's arguments about the dates dredged, this court carefully calculated the costs attributable to Diamond's dredging—disregarding the periods claimed before dredging started, while the dredge was idle at dock, and after dredging ceased. These calculations, attached to this Order in the Appendix, are protracted, theoretical, and possibly inaccurate. Furthermore, this court finds not only that this evidence is insufficient to sustain this method, but, also, that the result obtained by using this method does not achieve this circuit's two-fold purpose in allowing *quantum meruit* recovery. These calculations do not serve to measure the amount of damages necessary to prevent the breaching party, Magann, from being unjustly enriched, and such calculations are, also, insufficient to restore Diamond to the position it occupied prior to entry into its contract with Magann. *See Magann,* 775 F.2d at 1208. This court has reached the foregoing conclusion after a comparison of the DOD form method and the cubic yards method of valuation. Using the latter method, the evidence reveals that Magann has been enriched substantially more than would be concluded from evidence using the DOD form method, in association with the theories and assumptions required to meet the Court of Appeals' "threshold" mandate. Diamond has, also, claimed costs far in excess of the total costs provided by the truncation of the DOD form; therefore, this court finds the "cubic yards dredged" method to be the more accurate method for calculating the reasonable value of the benefit conferred by Diamond to Magann.

### B. *Cubic Yards Method of Valuation*

The better method of valuation in this case is to measure the materials dredged. While Magann introduced this alternative method of measurement in its memo received October 24, 1986, Diamond used this method in its December 17, 1987, Memorandum to prove its entitlement to damages. This court actually finds three measurements relevant to this method: cubic yards dredged; cubic yards placed; and cubic yards in the original contract.

### 1. The Original Contract and the Reasonable Price Per Yard

As previously stated, the original contract is evidence of the reasonable value of the services rendered. In this case, that evidence goes to the price per cubic yard and not the quantity of sand pumped. There is no doubt that the Corps of Engineers and, under the liability theory of this case, Magann, benefited from every cubic yard of sand that was pumped. R. at 2001. Judge Hawkins found that Diamond excavated substantially more material than that for which it was paid, and that the before and after measurement technique did not adequately measure the sand excavated by Diamond. *Magann,* 580 F.Supp. 1299, 1307. The inference this court feels to be logical from Judge Hawkins' findings is

---

**7.** Mobilization and Demobilization dates and costs are considered *infra* at 1208.

that the quantities stated in the contract, particularly with regard to Phase I, and the price bid with those quantities in mind, do not accurately reflect the amount of benefit Diamond conferred on Magann.

Under the contract, Magann and the other bidders bid dredge prices for estimated quantities of materials to be dredged from designated areas. For example, in the bid results (R. at 3086–87) Magann, in reliance on Diamond's bid price, bid $1.50 per yard for the 600,000 cubic yards estimated to be in item number 17, the Deposition Basin. According to the bid table, the 600,000 cubic yards included two feet of overdepth. (footnote on table, R. at 3086). These bid prices ranged between $0.95 and $2.30, or $570,000.00 to $1,380,000.00, for the dredging of the Deposition Basin. The average bid price, therefore, was $1.56 for the Deposition Basin.

Diamond, in its memorandum of December 16, 1986, argued that the per cubic yard bid prices that Diamond bid should be increased by twenty-seven per cent (27%). *Memorandum of Diamond Manufacturing Company, Inc., Concerning Recovery in This Action*, at 6 (received December 16, 1986). Diamond uses the $1.90 price that Merritt Construction Company bid for the Deposition Basin (R. at 1629, 3510), after Diamond had left the job, as a justification for increasing the per cubic yard bid price for all phases of the project. Diamond asserts that Merritt's price is a reasonable price for the Deposition Basin, "since Merritt did the dredging with the jetties in place and with knowledge of Diamond's problems." *Id.* at 6. There is no dispute that the jetties were in place by the time Merritt began dredging, and this court accepts the inference that Merritt may have used that fact in calculating its bid price. The finished jetties would logically have made Merritt's job easier, and decreased the bid price. This court, also, acknowledges that Merritt's $1.90 bid price, which was higher than the $1.56 average bid price, could possibly have been influenced by Merritt's knowledge of Diamond's difficulties, but there is no evidence in the

record to that effect. In fact, the only evidence regarding Merritt's bid price is Mr. William Magann's testimony that Merritt's price was higher because of an increase in cost. R. at 1705. Regardless of the reason, Merritt's $1.90 bid would be relevant to a decision on the reasonable price to charge, per cubic yard, for Deposition Basin dredging, because of the close proximity in the dates of dredging—Diamond would have started dredging the Deposition Basin sometime after June 4, 1980, and Merritt did start dredging the Basin sometime after September 15, 1980.

Merritt's bid price for Inner Channel "B" Excavation, however, is identical to Diamond's bid. In its bid letter, Merritt bid: (a) $10.00 per cubic yard for 1,000 yards in Inner Channel "B", and (b) $2.40 per cubic yard for 8,000 yards in Inner Channel "B". (R. at 1629, 3510). These prices are the same as the prices found in columns 19A ($2.40 for 27,000 cubic yards [8]) and 19B ($10.00 for 1,000 yards) in the bid results. R. at 3349, 3086–87. Because of the close proximity in the time that Diamond was dredging Inner Channel B (February 4 to March 18, 1980 (R. at 4221)), and the time that Merritt bid and dredged Inner Channel B (around October 1980), Merritt's bid is relevant to this court's calculation of the appropriate per yard price of the dredged yardage in Inner Channel B.

The conclusion which this court reaches from the foregoing discourse is that Diamond's argument that its contract price per yard should be increased by twenty-seven per cent is without merit. Any inference that this court could draw in Diamond's favor from the fact that Merritt bid a price twenty-seven per cent higher than Diamond's price per yard for the Deposition Basin, is counterbalanced by the fact that Merritt's bid was identical to Diamond's bid for Inner Channel B. Furthermore, Merritt's bid is only relevant in that it was made at approximately the same time Diamond was dredging the Project. *See* discussion *infra* note 11. Because Diamond did not dredge the Deposition Basin,

---

**8.** Merritt completed the dredging Diamond had started in Inner Channel B. R. at 4219.

it is not entitled to damages for that portion of the Project, and, therefore, evidence pertaining to the Deposition Basin is not relevant for this court's purposes. However, this court finds that Merritt's bid for the dredging in Inner Channel B should be incorporated into the determination of a reasonable price for Diamond's dredging of Inner Channel B, because of the close proximity between the date Diamond dredged that channel and the date Merritt bid and dredged the remainder of the channel.

Through a comparison of Magann's Unit Price Schedule (R. at 3348–49) and Diamond's confirmation letter (R. at 3375), this court determined the appropriate columns, in the bid results (R. at 3086–87), from which to find the following price ranges and price averages:

| Bid Item | Description | Price Range | Price Average |
|---|---|---|---|
| 15 | Entrance Channel | $2.17 to 1.30 | $1.80 |
| 16 | Auxiliary Channel | 1.90 to .94 | 1.60 |
| 18 | Inner Channel A | 1.60 to .95 | 1.37 |
| 19A | Inner Channel B | | |
| | (a) Beach Disposal | 4.00 to 1.74 | 2.30[9] |
| 20 | Pilot Channel | 3.84 to 1.60 | 2.98 |
| 21 | Pilot Channel Maintenance | 4.50 to 1.19 | 3.56 |

This court has concluded that the average price, bid by the bidders in 1977, is a reasonable price with which to compensate Diamond for the yardage it dredged. Further, because the average bid price is the price for which Magann reasonably could have secured like services, and because that bid price includes profit, this court finds that the profit included in the bid price is necessary in fixing the overall reasonableness of the services furnished by Diamond to Magann.

**2. Cubic Yards Placed**

█ An accurate measurement of the material that Diamond actually pumped out of the inlet is the quantity of sand and other material found in the dikes and on the beaches. This measurement necessarily involves before-and-after surveys of the areas to which Diamond pumped dredged materials. Accretion and erosion are also factors in determining the amount of yardage Diamond pumped out of the inlet. These statistics and surveys, however, are not available to this court in the current record. The only in-place measurement which this court finds substantiated in the

record is that of the south sand dike. *See* R. at 1828; 2846; 5141.

Because of the dearth of available data on the amount of yardage placed on the dikes and the beaches, this court finds that the "cubic yards placed" measurement of the amount of yardage dredged by Diamond, for the benefit of Magann, is unworkable for *quantum meruit* purposes. The amount of material placed on the south sand dike, however, is relevant to this court's calculation of an accurate erosion factor, particularly during Phase I of the dredging. This "run-off figure" is discussed in the context of the next section of this order.

**3. Cubic Yards Dredged**

█ The contract between Magann and Diamond provided for payment as follows:

The total amount of material removed and to be paid for under this contract will be measured by the cubic yard in place by computing the volume between the bottom surface shown by soundings of the last survey made before dredging and the bottom surface shown by the soundings of a survey made as soon as practicable after the entire work speci-

---

**9.** Includes Merritt's 2.40 bid.

fied within an acceptance section ... has been completed and included within the limits of the overdepth and side slopes ...

R. at 3241. *See* R. at 1782 (Corps of Engineer Officer Romanosky's explanation of payment). This measure of the material dredged, which is simply a measurement of the hole left after dredging, is the only measure fully substantiated by the record. Therefore, this court finds that the most accurate measure for *quantum meruit* damages is to calculate the quantity of material Diamond dredged out of the inlet. This calculation is best made using the Corps of Engineers' hydrographic survey results, but this court will not limit recovery to the amount of material for which Diamond would have been paid under the contract.

A summary of the Corps of Engineers' hydrographic surveys is in the record, (R. at 3728 (Magann Exhibit 92)), and is referred to by John E. Romanosky, the Corps' authorized representative on the project, on pages 1790 and 1859. Mr. Romanosky also testified as follows:

[T]he Corps benefited from every cubic yard of sand that was pumped. The people of the United States benefited from every cubic yard of sand that was pumped on this project, for it was moved from a channel and placed where it did some good, on the north beach nourishment, the south beach nourishment, the back beach nourishment, the south sand dike and the north sand jetty.

R. at 2001. Judge Hawkins found that all materials dredged were used to either build dikes or to nourish beach areas. *Magann*, 580 F.Supp. at 1310. Therefore, regardless of whether the excavated material was "overdepth" or "overwidth", terms the Corps of Engineers uses to designate material outside of the contract pay areas, the entire excavation, and all of the material thereby produced, benefited Magann.

In measuring the amount of material excavated, this court has relied on the Corps of Engineers' hydrographic survey results, which are found in the "Murrell's Inlet Dredging Log" summary. R. at 3728 and

attached as Exhibit 5 to the Appendix of this order. These surveys went outside the contract pay areas, in both width and in the depth of the excavation, R. at 1790, but this court finds that the surveys did not include the entire area dredged by Diamond in some of the sections. *See* R. at 1944 to 46 (Romanosky's admission). This court, also, has determined that the long acceptance sections, particularly in Phase II, *see Magann*, 580 F.Supp. at 1307, and the fact that the side slopes would not hold a four-to-one slope, *id.*, contributed to a decreased figure for gross yardage dredged in the hydrographic surveys. Furthermore, this court finds that there is substantial evidence in the record to support Diamond's proposition that the yardage attributed to the Phase I dredging is at least thirty per cent below the accurate amount.

Diamond's expert, Dr. Gregory N. Richardson, testified that the average run-off factor during construction of the South Sand Dike (Phase I), was between forty and fifty per cent. R. at 4163. Dr. Richardson, a geotechnical engineer, felt that the yardage for Inner Channel A was fairly accurate in Phase I (R. at 2863), because the currents in that area were much less than in other parts of the inlet. R. at 2829. In his testimony regarding the Intersection and the Auxiliary and Pilot Channels, however, Dr. Richardson found that the hydrographic surveys were not run wide enough to measure the volume of material that was removed (R. at 2841, 2842, 2862). He, also, testified that the grain-size distribution on the south sand dike proved that at least forty per cent of the material that had been pumped onto the dike had eroded or "run off" due to current velocities. R. at 2861–64.

Magann, through its counsel, disputes that any "run-off factor" exists in the context of this case. R. 1274. Mr. Romanosky, the Corps of Engineers' contracting officer's representative, espoused a "swell" theory to explain the difference between the sand dike size and the dredged-hole size (R. at 1491). The fact that there is no literature on this theory (R. at 1493), and that the general superintendent for Merritt Dredging Company, in his forty years in

the dredging business, had not heard of such a theory, (R. at 1648), makes Mr. Romanosky's theory incorrect in this court's opinion.

While Mr. Romanosky denied that there was any significant loss from run-off on the south sand dike, he did admit that there was some loss on the north beach nourishment area. R. at 1521. He also stated that a "small" amount of material, "twenty-five to thirty-five percent," could flow back into the dredged-out hole during the prosecution of the project. R. at 1481. During one stage of the project, Romanosky knew that "some" erosion had occurred due to a minor storm. R. at 1829, 1973–74. This court finds that Mr. Romanosky's testimony actually boosts the argument for an erosion factor.

The Vice President/Projects Engineer of Merritt Dredging Company estimated that the run-off factor for the type of material pumped onto the south sand dike was fifteen to twenty per cent. R. at 1622. Merritt's General Supervisor estimated that the run-off on the south sand dike was twenty-five to thirty per cent, and on the south beach, because of the shell mixed into the material, the run-off was twenty to twenty-five per cent. R. at 1648.

Joseph Griffin, who acted as a troubleshooter on the project for Diamond, estimated a thirty per cent run-off factor, but he was using figures he received from another Diamond employee, John Barber. R. at 1198. Barber allegedly told Griffin that a run-off figure of twenty-five to thirty-five per cent was an acceptable figure to all parties involved in the project. *Id.* Mr. Barber testified that the top of Inner Channel A is known for "migrating sands" (R. at 2565), and that the sand was "shoaling in or filling in" in back of the dredge. R. at 2540–41.

This court finds that an increase in Phase I yardage is supported by the testimony regarding Magann's decrease of Diamond's claimed yardage. The dredge log reflects that Diamond had dredged a total of 348,-764 cubic yards on October 31, 1978, and that Diamond had increased that total to 353,139 by November 1, 1978. R. at 3561,

3565 (Magann's Exhibit 39). These figures are echoed in the Report of Operations, submitted by William K. Gaskins, the construction inspector for the Corps of Engineers. R. at 3923. On the November 3, 1978, Report, however, the number 353,139 was stricken, and the number 206,691 was written as the "total amount dredged to date." R. at 3935. This change in yardage apparently was a result of discussions between Magann and the Corps of Engineers. R. at 2585.

During the trial of this case, Diamond disputed the accuracy of this reduction through the testimony of its construction superintendent, John A. Barber. Barber claimed to have surveyed the South Sand Dike as a check on his computation of the amount dredged. R. at 2558. In the invoice Barber apparently submitted at the end of October, he claimed that Diamond had dredged 348,746 cubic yards. R. at 2544, 4963 (Diamond's exhibit 16). That invoice was marked "void", and another invoice submitted with the amount of the cubic yards set forth thereon as 204,613 cubic yards. R. at 4962 (Diamond's Exhibit 15). The difference in the invoice amounts is 144,133 yards; the difference in the report of operations amounts is 146,448 yards.

This court finds some support for Diamond's claim of an additional 144,133 yards, but does not find sufficient evidence to allow this court to increase the yardage on the basis of John Barber's testimony and the dredge logs. This testimony does, however, strengthen this court's conviction that Diamond dredged substantially more material than was reflected in the hydrographic surveys. Therefore, because of the strong currents, the inaccuracy of the hydrographic surveys, the necessary over-dredging, and the overwhelming evidence of Diamond's dredging substantially more material than for which it was paid, *see Magann*, 580 F.Supp. at 1307, this court has determined that the amount of material specified in the Corps of Engineers surveys as being used to build the South Sand Dike during Phase I should be increased by thirty per cent. This court feels this increase

to be a conservative measure of the amount of material dredged by Diamond that was not included in the hydrographic surveys.[10]

The Phase I (September 20, 1978, to January 3, 1979), yardage taken from the hydrographic survey, Exhibit 5, is as follows:

| | |
|---|---|
| Auxiliary Channel (9/20/78—10/22/78) | |
| S. Sand Dike | 84,756 |
| Intersection, Entrance and Inner (9/24/78—10/22/78) | |
| S. Sand Dike | 47,755 |
| Pilot Channel | |
| (entrance) (10/8/78—11/2/78) | 103,460 |
| (Inner A) (12/5/78—1/2/79) | |
| 59% N. Nourishment | 100,466.38 |
| 41% S. Sand Dike | 69,815.62 |

For purposes of price allocation, this court makes reference to the distribution made by the Corps of Engineers in Column F "Additional Material Dredged During Other Phases" of the "Murrells Inlet Dredging Log" (also referred to by this court as the hydrographic survey summary). Exhibit 5. Of the 103,460 gross yards dredged by Diamond in the entrance part of the Pilot Channel, the Corps of Engineers assigned 19,448 cubic yards to Bid Item 15, the Entrance Channel. Because

this court has decided that the reasonable value of the benefit Diamond conferred on Magann should be measured in part by the average bid from the bid results, this court finds the bid item indicative of the appropriate price per cubic yard. This court further finds that the Corps of Engineers' allocation of 19,448 yards to the Entrance Channel yardage is a reasonable assessment of the comparable difficulty involved in obtaining this yardage; therefore, this court has subtracted the 19,448 yards from the 103,460 yards, leaving 84,012 yards as the number of yards classified under Bid Item 20.

This analysis also applies to the 65,527 cubic yards the Corps of Engineers allocated to Bid Item 18, the Inner Channel A, from Bid Item 20, the Pilot Channel. Exhibit 5. Therefore, the amount appropriately allocated to Bid Item 20 for the Inner Channel A dredging during December, 1978, and January, 1979, is 104,755 cubic yards.

With the above allocations taken into account, and omitting the yardage that was not deposited on the South Sand Dike, this court finds the thirty per cent increase in Phase I yardage to be as follows:

| Bid Item | | Area | Survey Yardage | | Thirty Per Cent | | Total Yardage |
|---|---|---|---|---|---|---|---|
| 16 | | Aux. Channel | 84,756 | + | 25,426.80 | = | 110,182.80 |
| 16 | | Intersection | 47,755 | + | 14,326.50 | = | 62,081.50 |
| 20 | | Pilot (Entrance) | 84,012 | + | 25,203.60 | = | 109,215.60 |
| 15 | | (Entrance Allocation) | 19,448 | + | 5,834.40 | = | 25,282.40 |
| 20 | | Pilot (Inner A) | (104,755) | | | | |
| | (59%) | N. Nourishment | 61,805.45 | + | 0 | = | 61,805.45 |
| | (41%) | S. Sand Dike | 42,949.55 | + | 12,884.87 | = | 55,834.42 |
| 18 | | (Inner A Allocation) | (65,527) | | | | |
| | (59%) | N. Nourishment | 38,660.93 | + | 0 | = | 38,660.93 |
| | (41%) | S. Sand Dike | 26,866.07 | + | 8,059.82 | = | 34,925.89 |

Multiplication of these yardages by the appropriate bid price results in the following:

---

**10.** The material from Inner Channel A that was not placed on the South Sand Dike will not be increased by thirty per cent, because Diamond's expert testified that the yardage for Inner A was fairly accurate. R. at 2863.

| Bid Item | Area | Yardage | | Price | | Total |
|---|---|---|---|---|---|---|
| 16 | Aux. Channel | 110,182.80 | × | $1.60 | = | $176,292.48 |
| 16 | Intersection | 62,081.50 | × | 1.60 | = | 99,330.40 |
| 20 | Pilot (Entrance) | 109,215.60 | × | 2.98 | = | 325,462.49 |
| 15 | (Entrance Allocation) | 25,282.40 | × | 1.80 | = | 45,508.32 |
| 20 | Pilot (Inner A) | | | | | |
| | N. Nourishment | 61,805.45 | × | 2.98 | = | 184,180.24 |
| | S. Sand Dike | 55,834.42 | × | 2.98 | = | 166,386.57 |
| 18 | (Inner A Allocation) | | | | | |
| | N. Nourishment | 38,660.93 | × | 1.37 | = | 52,965.47 |
| | S. Sand Dike | 34,925.89 | × | 1.37 | = | 47,848.47 |
| | | 497,988.99 | | | = | $1,097,974.44 |

Phase II of the project, referred to as the maintenance phase, involved widening the Pilot Channel and performing maintenance dredging in the Pilot Channel and Inner Channel A. R. at 5148, 4211. The Corps of Engineers listed Diamond as having dredged 96,344 gross yards in the entrance part of the Pilot Channel between April 30, 1979, and May 24, 1979. Exhibit 5. As in Phase I, the Corps of Engineers allocated a portion of one bid item's dredging to another bid item. In Phase II, the Corps of Engineers took 38,483 yards included in the 96,344 gross yards in Bid Item 21, and allocated the 38,483 yards to Bid Item 15, the Entrance Channel. The court finds this allocation reasonable; therefore, the damages for Phase II are as follows:

| Bid Item | Area | Amount | | Price | | Total |
|---|---|---|---|---|---|---|
| 21 | Pilot (Entrance) | 57,861 | × | $3.56 | = | $205,985.16 |
| 15 | (Entrance Allocation) | 38,483 | × | 1.80 | = | 69,269.40 |
| 21 | Pilot (Inner A) | 55,844 | × | 3.56 | = | 198,804.64 |
| | | | | | | $474,059.20 |

The Phase III surveys, for the Final Phase, were accurate in that the surveys went to the full width of the dredging and the currents were controlled by the jetties. R. at 2886. This court, therefore, finds that the hydrographic survey amounts are the appropriate amounts to use to award Diamond reasonable *quantum meruit* damages for the Final Phase. The amounts, multiplied by the appropriate bid price average, are as follows:

| Bid Item | Area | Amount | | Bid Price | | Total |
|---|---|---|---|---|---|---|
| 15 | Entrance | 160,240 | × | $1.80 | = | $288,432.00 |
| 18 | Inner A | 36,917 | × | 1.37 | = | 50,576.29 |
| | | 95,022 | × | 1.37 | = | 130,180.14 |
| | | 71,506 | × | 1.37 | = | 97,963.22 |
| 19 | Inner B | 7,171 | × | 2.30 | = | 16,493.30 |
| | | 18,660 | × | 2.30 | = | 42,918.00 |
| | | 3,272 | × | 2.30 | = | 7,525.60 |
| | | 8,900 | × | 2.30 | = | 20,470.00 |
| | | 21,968 | × | 2.30 | = | 50,526.40 |
| | | 423,656 | | | | $705,084.95 |

**1208**

4. Mobilization and Demobilization

■ The original contract between Magann and Diamond included a separate lump sum price for mobilization and demobilization. Because Diamond incurred costs in providing a benefit to Magann during mobilization and demobilization, and because Diamond has not been compensated for these costs under the court's current computation, this court finds mobilization and demobilization costs necessary to an accurate determination of reasonable *quantum meruit* damages.

Diamond's original contract rate for mobilization and demobilization was a total of $240,000.00. R. at 3348 and 3375. As the Court of Appeals has recently restated, "the contract price may be evidence of reasonable value of the services, [but] it does not measure the value of performance or limit recovery. Rather, the standard for measuring the reasonable value of the services rendered is the amount for which such services could have been purchased from one in the plaintiff's position at the time and place the services were rendered." *Blanton v. Friedberg*, 819 F.2d 489, 493 (4th Cir.1987) (quoting *United States v. Algernon Blair, Incorporated*, 479 F.2d 638, 641 (4th Cir.1973)). This court finds that mobilization and demobilization costs are supported in the record by the bid

results for the project. R. at 3086–87 (Magann's exhibit 3). Column 12 of the bid results, in which Diamond bid $80,000.00, corresponds to the dredging for Phase I "mobilization & demobilization of dredging plant for Pilot Channel Dredging." R. at 3348. Column 14, "*mobilization & demobilization of dredging plant for pilot channel maintenance dredging,*" for which Diamond bid $60,000.00, corresponds to the activity during Phase II of the Project. *Id.* The final dredging phase mobilization and demobilization bid, for which Diamond bid $100,000.00, is found in column 13 of the bid results. *Id.*

The Phase I bids range between $278,000 and $78,000 with an average (including Diamond's bid) of $144,956.70. Phase II bids average $80,456.70 and range between $60,000.00 and $100,000.00. In the Final Phase, the bids range between $100,000.00 and $272,000.00 and average $168,595.90.[11] Therefore, the reasonable value for the services rendered relating to mobilization and demobilization during Phase I and II is $144,946.70 and $80,456.70, respectively. The reasonable value of mobilization and demobilization during the Final Phase is $168,595.90. The total value of the mobilization and demobilization services rendered by Diamond to Magann is, accordingly, $394,009.30.

11. Merritt Dredging, the contractor that finished the project after Diamond's termination, bid, and was paid, $190,000.00 for mobilization and demobilization in the Deposition Basin and Inner Channel B. R. at 1702, 1629, 3510. This bid is included in this court's calculation of *quantum meruit* damages for the Final Phase of dredging activity. The measure this court must use in determining damages is "the amount for which such services could have been purchased from *one in the plaintiff's position at the time* and place the *services were rendered.*" *Blanton,* 819 F.2d at 493 (emphasis added). Diamond (in the position of the *Blanton* plaintiff for *quantum meruit* purposes) was in the same position as the other bidders on the date of the bid opening, July 14, 1977 (R. at 3119), which makes the average bid a reasonable measure of *quantum meruit* damages. This is particularly true because the dredging took place over a two year period, and calculations are difficult to make, based on the record before this court, of the amount a contractor would have charged

had he been rendering the services at the same time but with the knowledge Diamond possessed of the soil composition.

Although there is no direct testimony that Merritt knew of the difficulties Diamond had on the project, Merritt's higher-than-average bid suggests that this factor may have been a consideration in Merritt's $190,000.00 price for Final Phase mobilization and demobilization. There is testimony, however, that Merritt's price was higher than Diamond's because of inflation. R. at 1705. Merritt's bid was made on September 15, 1980, anticipating that dredging would commence October 15, 1980. R. at 1629, 3510. Diamond's bid was confirmed on August 23, 1977, but Diamond was preparing to dredge the Deposition Basin at the time it left the job, on June 4, 1980. R. at 5148. Therefore, the close proximity in time of Merritt's price for mobilization in the Final Phase, and the time Magann would have dredged the Basin, makes Merritt's $190,000.00 bid relevant to this court's calculations.

### 5. Summary of Cubic Yards Method of Valuation

This court finds the reasonable value of the dredging Diamond performed for Magann to be as follows:

| | |
|---|---|
| Phase I | $1,097,974.44 |
| Phase II | $ 474,059.20 |
| Phase III | $ 705,084.95 |
| Mobilization and Demobilization | $ 394,009.30 |
| | $2,671,127.89 |

### C. Conclusion

This court finds, after careful consideration of the two methods of valuation, that the cubic yards method is the more accurate method to determine the amount of benefit Diamond actually conferred on Magann. The cubic yards method is much better supported by the record than is the DOD form method, and the cubic yards method, also, directly addresses the question of the value "for which like services could have been purchased from one in the plaintiff's position at the time and place the services were rendered." *United States v. Algernon Blair, Inc.,* 479 F.2d 638 (4th Cir.1973) *as cited in Magann,* 775 F.2d at 1208. Accordingly, this court has determined that the reasonable value of the services and materials provided by Diamond to Magann is Two Million, Six Hundred Seventy–One Thousand, One Hundred Twenty–Seven Dollars and Eighty–Nine Cents ($2,671,127.89). The amount still owed Diamond by Magann, therefore, is One Million, One Hundred Seventy–One Thousand, Seven Hundred Eighty and Fifty–Nine/100ths Dollars ($1,171,780.59), which is the difference between the dollar amount of the benefit conferred, $2,671,-127.89, and the amount previously paid, $1,499,347.30.

Now, therefore, it is

ORDERED, that judgment be, and the same hereby is, entered for Diamond Manufacturing Company, Inc. against W.F. Magann Corporation and Aetna Casualty and Surety Company, jointly and severally, in the amount of One Million, One Hundred Seventy–One Thousand, Seven Hundred Eighty and Fifty–Nine/100ths Dollars ($1,171,780.59), plus interest at the rate established by 41 U.S.C. § 611 from the time that notice was given to the contracting officer on December 11, 1979,[12] until the amounts due under this judgment are paid by Magann and/or Aetna, its Miller Act Payment Bond Surety, plus all costs of this action.

AND IT IS SO ORDERED.

### APPENDIX

#### DOD Form Method of Valuation

Because the Court of Appeals stated in its remand order that "a threshold requirement for recovering *quantum meruit* damages is that the defendant receive the benefit of the plaintiff's performance," *Magann,* 775 F.2d at 1208, this court finds that Diamond cannot recover from Magann the costs incurred by Diamond before dredging began, while the dredge was idle at dock, or after dredging had ceased.

#### 1. Labor

The $85,171.00 claimed on Schedule A (R. at 4998, a copy of which is attached as Exhibit 1 to this order) for "Preparatory Labor from Feb. 1978 until June 13, 1978, 90% charged to this job," is not recoverable in this case, even though in some circumstances preparatory expenses are recovera-

---

12. This court agrees with the reasoning of the district court in its earlier opinion in this case as to its award of prejudgment interest from December 11, 1979. Furthermore, although the correctness of the award of prejudgment interest was presented to the Court of Appeals in the appeal of this case, Brief of Appellants, at 45, note 30, *Magann Corp. v. Diamond Manufacturing Co.,* 775 F.2d 1202 (4th Cir.1985), it was affirmed *sub silento,* since it was not discussed in the opinion of the appellate court. *See State v. Rhodes,* 112 Ariz. 500, 543 P.2d 1129, 1136 (1975) ("[A]ppeals cannot be allowed by piece-

meal. There must be an end to them as speedily as the contention of the litigants may be advanced and decided. So it is that all questions for review by an Appellate Court must be presented on the first appeal thereafter from a final judgment, or not at all; for thereafter all questions presented by the record will be considered as finally determined and all such questions not expressly affirmed or reversed will, by implication, be deemed affirmed."); *accord, Daviess–Martin Co. R. Tel. Corp. v. Public Service Comm.,* 132 Ind.App. 610, 174 N.E.2d 63, 64 (1961).

ble in *quantum meruit. Ballard v. Krause,* 248 So.2d 233 (Fla.App.1971). There is no evidence in the record which correlates the preparatory labor with any benefit received by Magann, and Diamond, therefore, has not met its threshold burden of proof.[A-1] This court, therefore, disallows the entire $85,171.00.

This court also disallows part of the costs claimed on Schedule A for "Aug. 1978 to Oct. 1980 for Supt., Capt., . . . [illegible] Engineer." The claimed costs are as follows:

| | |
|---|---|
| $142,766.00 | (Direct Labor) |
| $49,968.10 | (Fringe Benefits) |
| $14,686.43 | (FICA) |
| $8,903.27 | (Parts and Materials) [A-2] |

The amount is claimed for costs for a twenty-seven month period (August 1978 to October, 1980), even though Diamond was dredging only nine of those twenty-seven months.[A-3] Therefore, this court excludes 18/27, or 67%, of the claimed amount. The reasonable amount of supervisory expenses found under this method to have conferred a benefit on Magann is, accordingly, $215,473.80 × .33, or $71,106.35.

The chart, attached to this order as Exhibit 2, is a reproduction of the other labor costs claimed in the first three columns of Schedule A. With reference to this court's Exhibit 2, the following amounts are also disallowed as labor costs:

Diamond claimed $111,258.83 for labor from August 18, 1978, to September 28, 1978. Dr. Richardson's testimony, however, reveals that Diamond did not start dredging until September 20, 1978. R. at 5448.

Therefore, 33 of the 42 days (or .79) must be disallowed.

$$\$111,258.83 \times .79 = \$87,894.48 \text{ disallowed}$$
$$\times .21 = \$23,364.35 \text{ allowed}$$

Diamond claimed $32,041.30 for labor from December 30, 1978, to January 26, 1979. Diamond only dredged 5 of the 28 days claimed (R. at 5448), and is, therefore, only entitled to 5/28 or .18 of the claimed amount.

$$\$32,041.30 \times .82 = \$26,273.87 \text{ disallowed}$$
$$\times .18 = \$5,767.43 \text{ allowed}$$

Diamond claimed $40,722.31 for labor costs from April 28, 1979, to May 25, 1979. Because Diamond did not start dredging until May 1, 1979 (R. at 5448), three of the twenty-eight days claimed, or .11, must be disallowed.

$$\$40,722.31 \times .11 = \$4,479.45 \text{ disallowed}$$
$$\times .89 = \$36,242.86 \text{ allowed}$$

Diamond claimed $33,377.41 for labor costs from May 26, 1979, to June 29, 1979. Six of the 35 days claimed, from June 24 to June 29, 1979, inclusive, must be disallowed because Diamond stopped dredging on June 23, 1979.

$$\$33,377.41 \times .17 = \$5,674.16 \text{ disallowed}$$
$$\times .83 = \$27,703.25 \text{ allowed}$$

Diamond claimed $24,763.57 for work from February 1, 1980, to February 29, 1980, but did not start dredging until February 4, 1980. R. at 5448. Therefore, three of the twenty-nine days claimed, or .1, must be disallowed.

**A-1.** In his deposition, Donald Austin, the Chief Executive Officer of Diamond, claimed that Diamond started "getting the equipment in shape" six or seven months before August, 1978. Although this corresponds to the claimed time period, this does not provide evidence that these preparatory expenses were necessary for the prosecution of the dredging.

**A-2.** The $8,053.27 figure is something of an enigma for the court. It is included in both the "Parts and Materials" column, and on the line for compensation for supervisory personnel. Because this strange allocation may have been for some accounting purpose unknown to this court and not in evidence in the record, and because the simplest and most logical allocation, for this court's purpose, is with the supervisory labor costs, the $8,053.27 is included here and not in the "Parts and Materials" allocation.

**A-3.** The court included October through December, 1978, May through June, 1979, and February through May, 1980. The months excluded were August through September, 1978, January through April, 1979, July, 1979, through January, 1980, and June through October, 1980.

$$\$24,763.57 \times .1 = \$2,476.36 \text{ disallowed}$$
$$\times .9 = \$22,287.21 \text{ allowed}$$

Diamond also claimed $28,524.78 for labor costs from May 31, 1980, to June 27, 1980. Dr. Richardson testified that dredging ended on June 4, 1980. Therefore, 23 of the 28 days claimed, or .82, must be disallowed.

$$\$28,524.78 \times .82 = \$23,390.32 \text{ disallowed}$$
$$\times .18 = \$5,134.46 \text{ allowed}$$

The remaining disallowed amounts are as follows:

$53,872.10 (claimed for January 17, 1979, to April 27, 1979, when the dredge was "idle at dock")

$121,824.70 (claimed for June 30, 1979, to January 31, 1980, when the dredge was "idle at dock")

$58,816.24 (claimed for June 28, 1980, to September 26, 1980, after Diamond had left the job)

In summary, this court finds that $614,240.13 must be disallowed in the costs of labor computation. There is no evidence in the record that this amount represents the value of labor provided to Magann by Diamond. Accordingly, the reasonable value, as calculated under this method, of the labor provided by Diamond to Magann was $546,998.29.

### 2. Fuel Oil and Parts and Materials Purchased

Through computation, the fourth and fifth columns of Schedule A are found to support Diamond's claim for $255,556.59 for "Fuel Oil" and $192,792.26 for "Parts and Materials Purchased." Again, Diamond's claimed costs in these categories include costs for periods when Diamond was "Idle at Dock" and not performing any work for Magann (January through April, 1979, and July, 1979, through January, 1980). These figures also include costs after Diamond had left the job in June, 1980.

The charts, attached to this order as Exhibits 3 and 4, illustrate the method by which this court arrived at the allowable amounts for fuel oil and materials and parts.

With reference to Exhibits 3 and 4, this court finds that the reasonable cost, under this theory, of the fuel oil provided by Diamond to Magann was $187,662.49, and the reasonable cost of the materials provided was $109,353.45.

### 3. Repairs

This court finds that the majority of the repair costs claimed by Diamond, as itemized in Schedule B attached to the DOD Form (R. at 4999–5000 and 3674–3675), relate to work orders authorized before Diamond started work on the Project. Therefore, because the evidence does not support that Work Orders R3657, R3659 and R3700 are related to costs incurred in the prosecution of the Project, those repairs, in the total amount of $97,497.44, are not recoverable by Diamond. The reasonable cost of the repairs made that inured to Magann's benefit was $39,661.69.

### 4. Overhead

Diamond computed its material overhead as .075 of its material costs and this court finds that to be a reasonable percentage. With the reduced figures for fuel oil, parts and repairs, total cost for materials was $336,677.63. Material overhead that benefited Magann, therefore, was $25,250.82.

Diamond computed its operations overhead as .15 of its total labor costs, and this court finds that to be a reasonable percentage. Because this court has found that the total labor cost of the Project was $546,008.29, this court finds that reasonable operations overhead for the Project was $82,049.74.

### 5. Equipment Rental

The DOD form states that the amount claimed for equipment rental $396,000.00, represents "$2,000.00 per working day for use of dredge and auxilary [sic] vessels and equipment." On page seven of its memo filed October 14, 1986, Magann claims that the logs indicate that there were only 62 working days. This court finds, however, that the dredge and equipment were on the job at least for the 198 days claimed, and that any downtime attributable to repairs or to moving the pipeline inured to Ma-

gann's benefit. Even discounting the time that the dredge was "idle at dock," this court finds $396,000.00 to be a reasonable cost for equipment rental.

### 6. Administrative Expenses

Although Diamond's accountant testified that eight per cent was an extremely low figure to use to calculate Diamond's administrative expenses on this job, this court finds, in light of the fact that there was no further evidence of what would have been an accurate number, that eight per cent of total costs is a reasonable figure to use to calculate administrative expenses. Accordingly, the court finds that $110,958.12, (eight per cent of $1,386,976.48), is a reasonable measure of the cost of administrative expenses by Diamond while working on the Project.

### 7. Mobilization and Demobilization

Although not directly claimed in the DOD form, Diamond incurred costs in providing a benefit to Magann during mobilization and demobilization. Because this court excluded the labor, fuel and materials claimed before dredging started and after dredging ended, Diamond has not been compensated, under the court's current computation, for mobilization and demobilization costs. The total value of the mobilization and demobilization services rendered by Diamond to Magann was $394,009.30. *See* discussion *supra* p. 1208.

### 8. Summary of DOD Form Method of Valuation

| | |
|---|---|
| Labor | $546,998.29 |
| Fuel | 187,662.49 |
| Parts | 109,353.45 |
| Repairs | 39,661.69 |
| Material Overhead | 25,250.82 |
| Operations Overhead | 82,049.74 |
| Equipment Rental | 396,000.00 |
| Admin. | 110,958.12 |
| Mob. & Demob. | 394,009.30 |
| | $1,891,943.90 |

Therefore, One Million, Eight Hundred Ninety–One Thousand, Nine Hundred Forty–Three and Ninety/100ths Dollars ($1,891,943.90) is the total dollar amount of the services and materials provided by Dia-

mond to Magann that is calculable using the truncated DOD form. This court, however, finds that this measure of the value of the services is neither "precise" nor "reasonable," and, furthermore, is not the appropriate basis for an award of *quantum meruit* damages.

The Court of Appeals remanded this case for a "precise determination of the reasonable value of the services and materials provided by Diamond and for a determination of whether all or any portion of the profits awarded are necessary to reasonably compensate Diamond for the services and materials provided." *Magann*, 775 F.2d at 1208. Using the DOD form, and various calculations, this court was able to determine that dredging, mobilization and demobilization, cost Diamond approximately $1,892,943.00. During the calculations, however, this court excluded $1,051,127.56 of Diamond's costs claimed on the DOD form. These exclusions included days Diamond was not actually dredging and fractional amounts for supervisory expenses, labor, fuel oil, materials and parts, not attributable to the days Diamond was actually dredging. This court has strong reservations as to the accounting or bookkeeping accuracy of excluding fractions of claimed amounts, and also has doubts that the dollar amount calculated using the DOD form accurately reflects the cost to Diamond of providing dredging services to Magann. Moreover, this court recognizes that the cost to Diamond is not the appropriate measure of the reasonable value of Diamond's services, but that "[t]he standard for measuring the reasonable value of the services rendered is the amount for which such services could have been purchased from one in the plaintiff's position at the time and place the services were rendered." *Magann*, 775 F.2d at 1208 (citation omitted).

Using the cubic yards method, this court found that the amount for which Magann could have purchased the same services from one in Diamond's position at the time and place the services were rendered was $2,671,127.89. The disparity between the amount this court found to have been the

reasonable value of the services rendered ($2,671,127.89), and the amount of the cost to Diamond calculable using the DOD form ($1,891,943.90), is further evidence of the unreasonableness of using the DOD form costs to award *quantum meruit* damages. This disparity would be lessened by an award of profits to Diamond, but the fallacy of using the DOD form method becomes apparent when this court calculates the percentage of profit necessary to reasonably compensate Diamond for the services and materials it provided.

In discussing the role of profits in *quantum meruit* recovery, the Court of Appeals stated as follows:

Thus, profits per se have no place in a *quantum meruit* recovery. They may be considered, however, to the extent that they may have a bearing upon assessing the reasonable value of the aggrieved party's performance. From the District Court's Opinion, we cannot tell whether the award of lost profit acted merely as enhancement of the damages or whether it was a consideration in fixing the overall reasonableness of the value of the materials and services furnished by Diamond. Furthermore, the District Court did not make a precise finding as to the reasonable value of the services rendered by Diamond to Magann at the time that they were provided. Since the District Court did not make such a determination, we deem it appropriate to remand this case to the District Court to determine whether it is necessary to award profits to Diamond and, if so, at what rate in order for Diamond to be reasonably compensated

for the services and materials which were furnished to Magann.

*Magann,* 775 F.2d at 1208. The cubic yards method, because it incorporated bids, included an average of the profit each bidder felt necessary to successfully complete the project. This court found that award of profit reasonable in the context of calculating the amount for which Diamond's services could have been purchased from one in its position at the time and place the services were rendered.

In order to reasonably compensate Diamond using the amount derived from the DOD form method, and to prevent Magann from being unjustly enriched, this court would have to award over forty per cent of the calculated costs. The costs ($1,891,-943.90), plus forty-two per cent of the costs ($794,616.34), equal $2,686,560.34, an approximation of this court's cubic yards method calculation of the reasonable value of the services rendered. Obviously, an award of profits at forty per cent of costs would be unreasonable for this type of service, particularly where Diamond only claimed fifteen per cent.

Therefore, because of this court's doubts about the accuracy of the method; because this court finds the cost to Diamond to be an inappropriate measure of *quantum meruit* damages; and because the award of profits necessary to reasonably compensate Diamond and to prevent Magann from being unjustly enriched is unreasonably large, this court finds the DOD form method to be an unsuitable means of calculating *quantum meruit* damages in this case.

## EXHIBIT 1

| Date | | | | |
|---|---|---|---|---|
| Aug. 18/Sept. 28,78 | 82413.97 | 28844.86 | | 21648.27 | 3925.79 |
| Oct. 27, 1978 | 6.04 / 5157 | 12104018 | | -11880150 | 17145108 |
| Nov. 24, 1978 | 4274.081 | 14959.26 | | 14948111 | 855.08 |
| Dec. 29, 1978 | 38169.44 | 13957.28 | 7364.75 | 2476203 | 2817.24 |
| Jan. 26, 1979 | 20568.52 | 719896 | 4273.82 | 2.7944 | 6254.29 |
| Feb. 23, 1979 | 13170.96 | 4610.982 | 3529.58 | 11684 | 112.7704 |
| Mar. 30, 1979 | 10538.05 | 3688.30 | 2910.41 | 26377 | 1354.05 |
| Apr. 27, 1979 | 7519.64 | 3358.28 | 2417.06 | 977.134 | 41140.45 |
| May 26, 1979 | 26751.44 | 70930.0 | 6687.87 | 22311337 | 3489.22 |
| June 29, 1979 | 21618.52 | 7566.45 | 4178.44 | 4.0325 | 14412.01 |
| July 27, 1979 | 8710.61 | 34487.1 | 12280.83 | 6298.10 | 1731.06.19 |
| Aug. 31, 1979 | 10916.30 | 382069 | 2936.25 | 40061 | 1634.46 |
| Sept. 28, 1979 | 14758.72 | 51646.0 | 12305.48 | 32289 | 2974.11 |
| Oct. 26, 1979 | 16519.14 | 545817 | 2570.14 | | 20397 |
| Nov. 30, 1979 | 9483.55 | 331922 | 2431.32 | 68415 | 249820 |
| Dec. 28, 1979 | 6744.38 | 235947 | 11646.70 | 21947 | 643.44 |
| Jan. 31, 1980 | 11382.02 | 87836.9 | 2890.71 | 1494614 | 123070 |
| Feb. 29, 1980 | 15787.16 | 552550 | 3450.91 | 1548914 | 32972.33 |
| Mar. 28, 1980 | 24539.63 | 85188.86 | 5560.56 | 6139306 | 33220.03 |
| Apr. 25, 1980 | 30988.73 | 10847.05 | 7105.942 | 56735.98 | 18225.89 |
| May 30, 1980 | 44528.65 | 16593.98 | 10010.96 | 7623.66 | 1460.67 |
| June 27, 1980 | 17834.96 | 624223 | 4447.59 | 652763 | 1218573 |
| July 25, 1980 | 14847.30 | 51965.5 | 3568.79 | 501.29 | 2793.23 |
| Aug. 29, 1980 | 16634.70 | 482270 | 4230.89 | 13677 | 2751297 |
| Sept. 26, 1980 | 5941.08 | 207900 | 1495.23 | 1 | |

**#37**

## SCHEDULE "A"

| | | | | | |
|---|---|---|---|---|---|
| Aug. 1978 – Oct. 1980 for supt, capt & P.E. Engineer | 142766.00 | 43968.10 | 14686.43 | | 8053.27 |
| Preparatory Labor from Feb. 1978 until June 13, 1978 90% claimed to this job | 63090 – | 22080 – | | | |
| TOTAL | 779226.85 | 271797.14 | 109611.4 | 255865.49 | 927722.4 |

## EXHIBIT 2

| Date | Direct Labor | Fringe Benefits | FICA | Total Claimed |
|---|---|---|---|---|
| (Aug. 18–) Sept. 28, 1978 | $82,413.97 | $28,844.86 | – | $111,258.83* |
| (Sept. 29–) Oct. 17, 1978 | 60,115.57 | 21,040.53 | – | 81,156.00 |
| (Oct. 28–) Nov. 24, 1978 | 42,740.81 | 14,959.26 | – | 57,700.07 |
| (Nov. 25–) Dec. 29, 1978 | 38,169.44 | 13,359.28 | 7,364.75 | 59,893.47 |
| (Dec. 30–) Jan. 26, 1979 | 20,568.52 | 7,198.96 | 4,273.82 | 32,041.30* |
| (Jan. 27–) Feb. 23, 1979 | 13,170.96 | 4,609.82 | 3,529.58 | 21,310.36+ |
| (Feb. 24–) Mar. 30, 1979 | 10,538.05 | 3,688.30 | 2,910.41 | 17,136.76+ |

| Date | Direct Labor | Fringe Benefits | FICA | Total Claimed |
|---|---|---|---|---|
| (Mar. 31–) Apr. 17, 1979 | 9,595.64 | 3,358.28 | 2,471.06 | 15,424.98+ |
| (Apr. 28–) May 25, 1979 | 25,951.44 | 9,083.00 | 5,687.87 | 40,722.31* |
| (May 26–) June 29, 1979 | 21,618.52 | 7,566.45 | 4,192.44 | 33,377.41* |
| (June 30–) July 17, 1979 | 8,710.61 | 3,048.71 | 2,280.83 | 14,040.15+ |
| (July 28–) Aug. 31, 1979 | 10,916.30 | 3,820.69 | 2,936.25 | 17,673.24+ |
| (Sept. 1–) Sept. 28, 1979 | 14,758.72 | 5,164.60 | 2,305.48 | 22,228.80+ |
| (Sept. 29–) Oct. 26, 1979 | 15,596.14 | 5,458.17 | 2,590.14 | 23,644.45+ |
| (Oct. 27–) Nov. 30, 1979 | 9,483.55 | 3,319.22 | 2,431.32 | 15,234.09+ |
| (Dec. 1–) Dec. 28, 1979 | 6,741.38 | 2,359.47 | 1,646.70 | 10,747.55+ |
| (Dec. 29–) Jan. 31, 1980 | 11,382.02 | 3,983.69 | 2,890.71 | 18,256.42+ |
| (Feb. 1–) Feb. 29, 1980 | 15,787.16 | 5,525.50 | 3,450.91 | 24,763.46* |
| (Mar. 1–) Mar. 28, 1980 | 24,539.63 | 8,588.86 | 5,500.56 | 38,629.05 |
| (Mar. 29–) Apr. 25, 1980 | 30,988.73 | 10,846.05 | 7,058.42 | 48,893.20 |
| (Apr. 26–) May 30, 1980 | 44,525.65 | 15,583.98 | 10,010.96 | 70,120.59 |
| (May 31–) June 27, 1980 | 17,834.96 | 6,242.23 | 4,447.59 | 28,524.78* |
| (June 28–) July 25, 1980 | 14,847.30 | 5,196.55 | 3,568.79 | 23,612.64+ |
| (July 26–) Aug. 29, 1980 | 16,634.70 | 4,822.70 | 4,230.89 | 25,688.29+ |
| (Aug. 30–) Sept. 26, 1980 | 5,941.08 | 2,079.00 | 1,495.23 | 9,515.31+ |
| | 573,570.85 | 199,748.06 | 87,274.71 | $860,593.62 |

*Amount allowed decreased
+Disallowed

EXHIBIT 3

| Date | Fuel Oil Claimed | Days Dredged Total Days Claimed | Total Allowed |
|---|---|---|---|
| (Aug. 18–) Sept. 28, 1978 | $21,648.27 | 9/42 (21%) | $ 4,546.14 |
| (Sept. 29–) Oct. 17, 1978 | 18,801.50 | 100% | 18,801.50 |
| (Oct. 28–) Nov. 24, 1978 | 14,968.11 | 100% | 14,968.11 |
| (Nov. 25–) Dec. 29, 1978 | 24,762.03 | 100% | 24,762.03 |
| (Dec. 30–) Jan. 26, 1979 | 279.46 | 5/28 (18%) | 50.30 |
| (Jan. 27–) Feb. 23, 1979 | 168.14 | 0 | 0 |
| (Feb. 24–) Mar. 30, 1979 | 263.77 | 0 | 0 |
| (Mar. 31–) Apr. 17, 1979 | 9,771.34 | 0 | 0 |
| (Apr. 28–) May 25, 1979 | 22,313.37 | 25/28 (89%) | 19,858.90 |
| (May 26–) June 29, 1979 | 403.25 | 29/35 (83%) | 334.70 |
| (June 30–) July 17, 1979 | 6,298.10 | 0 | 0 |
| (July 28–) Aug. 31, 1979 | 400.61 | 0 | 0 |
| (Sept. 1–) Sept. 28, 1979 | 322.89 | 0 | 0 |
| (Sept. 29–) Oct. 26, 1979 | – | 0 | 0 |
| (Oct. 27–) Nov. 30, 1979 | 684.15 | 0 | 0 |
| (Dec. 1–) Dec. 28, 1979 | 219.43 | 0 | 0 |
| (Dec. 29–) Jan. 31, 1980 | 14,945.14 | 0 | 0 |
| (Feb. 1–) Feb. 29, 1980 | 15,489.14 | 25/29 (90%) | 13,940.23 |
| (Mar. 1–) Mar. 28, 1980 | 709.28 | 100% | 709.28 |
| (Mar. 29–) Apr. 25, 1980 | 51,383.06 | 100% | 51,383.06 |
| (Apr. 26–) May 30, 1980 | 36,935.98 | 100% | 36,935.98 |
| (May 31–) June 27, 1980 | 7,623.66 | 5/28 (18%) | 1,372.26 |
| (June 28–) July 25, 1980 | 6,527.63 | 0 | 0 |
| (July 26–) Aug. 29, 1980 | 501.29 | 0 | 0 |
| (Aug. 30–) Sept. 26, 1980 | 136.99 | 0 | 0 |
| | $255,556.59 | | $187,662.49 |

EXHIBIT 4

| Date | Materials and Parts Claimed | Days Dredged Total Days Claimed | Total Allowed |
|---|---|---|---|
| (Aug. 18–) Sept. 28, 1978 | $ 8,925.74 | 9/42 (21%) | $ 1,874.41 |
| (Sept. 29–) Oct. 17, 1978 | 7,145.05 | 100% | 7,145.05 |
| (Oct. 28–) Nov. 24, 1978 | 4,855.08 | 100% | 4,855.08 |
| (Nov. 25–) Dec. 29, 1978 | 6,217.24 | 100% | 6,217.24 |
| (Dec. 30–) Jan. 26, 1979 | 6,254.29 | 5/28 (18%) | 1,125.77 |
| (Jan. 27–) Feb. 23, 1979 | 1,277.04 | 0 | 0 |
| (Feb. 24–) Mar. 30, 1979 | 1,354.05 | 0 | 0 |
| (Mar. 31–) Apr. 17, 1979 | 4,140.45 | 0 | 0 |
| (Apr. 28–) May 25, 1979 | 3,489.22 | 25/28 (89%) | 3,105.41 |
| (May 26–) June 29, 1979 | 1,412.01 | 29/35 (83%) | 1,171.97 |
| (June 30–) July 17, 1979 | 13,106.19 | 0 | 0 |
| (July 28–) Aug. 31, 1979 | 1,634.46 | 0 | 0 |
| (Sept. 1–) Sept. 28, 1979 | 2,974.11 | 0 | 0 |
| (Sept. 29–) Oct. 26, 1979 | 2,039.37 | 0 | 0 |
| (Oct. 27–) Nov. 30, 1979 | 2,498.20 | 0 | 0 |
| (Dec. 1–) Dec. 28, 1979 | 643.44 | 0 | 0 |
| (Dec. 29–) Jan. 31, 1980 | 1,230.70 | 0 | 0 |
| (Feb. 1–) Feb. 29, 1980 | 3,292.33 | 25/29 (90%) | 2,963.10 |
| (Mar. 1–) Mar. 28, 1980 | 29,146.98 | 100% | 29,146.98 |
| (Mar. 29–) Apr. 25, 1980 | 33,220.03 | 100% | 33,220.03 |
| (Apr. 26–) May 30, 1980 | 18,225.89 | 100% | 18,225.89 |
| (May 31–) June 27, 1980 | 1,680.67 | 5/28 (18%) | 302.52 |
| (June 28–) July 25, 1980 | 2,185.75 | 0 | 0 |
| (July 26–) Aug. 29, 1980 | 278.23 | 0 | 0 |
| (Aug. 30–) Sept. 26, 1980 | 27,512.47 | 0 | 0 |
| | $184,738.99 | | $109,353.45 |

EXHIBIT 5

#41

**PURCELL'S INLET DREDGING LOG**

| Bid Item | Description | A Date Dredged | B Dredge Area | C Gross Yardage | D Dredged Pay Yards In Prism | E Matl. Outside Pay Prism Overdepth and/or Overwidth | F Additional Matl Dredge during Other Phases | G Total Material Paid for | H Material Paid for Under Diff. Bid Items | I Bid Quantity | J Bit Price | K Amount Paid | L % over Group |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 15 | Entrance Channel | 4/13/80-6/3/80 | M.Nourishment | 160240 cy | 109109 cy | | | 109109 cy | | | | | |
| | (cut during maint.dredging) | 6/30/78-6/28/78 | N.Nourishment | N/A | N/A | 53131 cy | 36483 cy | 38483 cy | | 212000 cy | 1.70 | $247506.40 | 50% |
| | (cut during Pilot dredging) | 10/5/78-11/2/78 | S. Sand Dike | 160240 cy | 109109 cy | 53131 cy | 19648 cy | 175597 cy | | | | | |
| 16 | Auxiliary Channel | 9/20/78-10/22/78 | S.Sand Dike | 60767 cy | 60767 cy | 24389 cy | | 60767 cy | | 92000 cy | 1.60 | $152468.00 | 57% |
| | (Intersection,Entrance)Inner A | 9/24/78-10/22/78 | S.Sand Dike | 17755 cy | 33423 cy | 12932 cy | | 34823 cy | | | | | |
| | | | | 93390 cy | 93390 cy | 37221 cy | | 95590 cy | | | | | |
| 17 | Redredge Aux. Chan. | 12/9/80-12/18/80 | S.Sand Dike | 47979 cy | 29241 cy | 18738 cy | | 29241 cy | 2941 cy bid item 16 | | | 1.65 | $ 6785.60 | N/A |
| | | | | | | | | | 4255 cy bid item pd0020 | | | 1.60 | $ 14590.60 | N/A |
| | | | | | | | | 29390 cy | | | | | |
| 17 | Deposition Basin | 11/1/80-12/9/80 | S.Nourishment | 542944 cy | 475654 cy | 67290 cy | | 475654 cy | | 600000 cy | 1.50 | $713481.00 | 14% |
| 18 | Inner Channel "A" | 4/22/80-2/12/80 | N. Nourishment | 38917 cy | 25127 cy | 11790 cy | | 25127 cy | | | | | |
| | 40423 to 43900 | 3/27/80-4/6/80 | M. Nourishment | 95022 cy | 72925 cy | 22147 cy | | 72925 cy | | | | | |
| | 43900 to 55900 | 3/10/80-3/27/80 | M. Nourishment | 71506 cy | 50720 cy | 20784 cy | | 50720 cy | | | | | |
| | 55900 to 65950 | | 58% M. Nourish. | | | | | | | | | | |
| | (Cut and Ring Pilot Dredging | 12/5/78-1/2/79 | 41% S.Sand Dike | N/A | N/A | N/A | 65527 cy | 65527 cy | | 222000 cy | 1.60 | $342878.40 | 37% |
| | | | | 205305 cy | 148772 cy | 54725 cy | | 210290 cy | | | | | |
| 19 | Inner Channel "B" | 3/18/80-4/6/80 | N. Nourishment | 7171 cy | 2645 cy | 4526 cy | | 2645 cy | | | | | |
| | 68921 to 88100 | 2/20/80-2/27/80 | Beach Disposal | 18660 cy | 9753 cy | 8907 cy | | 9753 cy | | | | | |
| | 88100 to 99100 | 2/14/80-27 /80 | Beach Disposal | 3272 cy | 992 cy | 2280 cy | | 3272 cy | | | | | |
| | 111900 to 131900 | 1/22/80-2/14/80 | Beach Disposal | 8900 cy | 4796 cy | 4104 cy | | 4796 cy | | | | | |
| | 129900 to 137900 | 1/22/80-2/15/80 | Beach Disposal | 21908 cy | 11105 cy | 10853 cy | | 11105 cy | | | | | |
| | 141900 to 151900 | | | 59991 cy | 29291 cy | 30690 cy | | 29291 cy | | 27000 cy | 2.40 | $ 70288.61 | 104% |
| | 191900 to 196920 | 12/17/80-12/18/80 | Beach Disposal | 12881 cy | 8510 cy | 4471 cy | | 8510 cy | | 6000 cy (Pu-D Pond) | 6.44 | $ 37794.41 | 52% |
| 20 | Pilot Channel | 90/8/78-11/2/78 | S. Sand Dike | 103460 cy | 64202 cy | 4924 cy | | 64202 cy | | 44202 cy | | | |
| | 10900 to 38925(entrance) | | | | | 18450 on | | 4924 cy | | | | | |
| | | | 59% M. Nour. | | | 14842 cy | | | | | | | |
| | 40122 to 64150 (Inner A) | 12/5/78-1/2/79 | 41% S.Sand Dike | 170282 cy 104755 cy | 104755 cy | 49436 | | 104755 cy | | | | | |
| | | | | | | 16072 | | | 4945 see bid item 18 | | | | |
| | | | | 275952 cy | 168957 cy | 104785 cy | | 168957 cy | 16921 65527 cy | 80000 cy | 1.60 | $320027.20 | 62% |
| 21 | Pilot Channel Maintenance | 4/30/79-5/24/79 | N.Nourishment | 96354 cy | 41032 cy | 55352 cy | | 41032 cy | 11725 see bid item 15 | | | | |
| | 10900 to 40900 (Entrance) | 5/20/79-6/23/79 | Beach Adj Item to Inner A | 55814 cy | 28957 cy | 21587 cy | | 35054 cy | 5978 20296 | 50000 cy | 1.60 | $104007.60 | 114% |
| | 40975 to 65900 (Inner A) | | | 151188 cy | 69957 cy | 81111 cy | | 28957 cy | 38483 cy | 65000 cy | 1.60 | $202233.60 | 4% |
| | | | | | | | | 69051 cy | | | | | |
| | | | | | | | | 126024 cy | | | | | |
| | Totals To Date | | | 1384051 cy 1133813 cy 450238 cy | | | | | | | | | |
| | | M. Nourishment | | 568716 cy | | | | | | | | | |
| | | S. Sand Dike | | 353744 cy | | | | | | | | | |
| | | N. Nourishment | | 362944 cy | | | | | | | | | |
| | | Other | | 121627 cy | | | | | | | | | |
| | | | | 1384051 cy | | | | | | | | | |